UNITED STATES of America, Appellee,

v.

Robert NOCELLA, Sr., a/k/a Doc, Defendant, Appellant.

No. 87–1929.

United States Court of Appeals, First Circuit.

Heard April 7, 1988.

Decided June 13, 1988.

**34**

Stephen T. Jeffco, Portsmouth, N.H., for defendant, appellant.

Deborah C. Sharp, Asst. U.S. Atty., with whom Richard V. Wiebusch, U.S. Atty., Concord, N.H., was on brief, for appellee.

Before COFFIN, TORRUELLA and SELYA, Circuit Judges.

SELYA, Circuit Judge.

Following a jury trial, defendant-appellant Robert "Doc" Nocella was convicted of distribution of cocaine, conspiracy to distribute cocaine, and threatening a witness. *See* 21 U.S.C. §§ 841(a)(1), 846; 18 U.S.C. § 1512(b)(3). The defendant appeals, claiming that the district court erred in denying his pretrial motions (i) to exclude a tape recording, and (ii) to suppress incriminating evidence found in a search of his home. We affirm.

## I. BACKGROUND

Federal, state, and local authorities received bits and pieces of information about "Doc" Nocella from a variety of sources over a period of time. Many of these insights were thought dependable. When pooled, they led the gendarmes to believe that Nocella, along with his live-in bodyguard (Howie), was dealing drugs from the isolated confines of appellant's country home (located at the end of a mile-long dirt road known as "Jampsa Trail") in rural Nottingham, New Hampshire. In late 1986, a task force composed of agents of the federal Drug Enforcement Administration (DEA) and troopers attached to the New Hampshire State Police special investigations unit (SIU) began to focus on Nocella in earnest. We submit a synopsized summary of what occurred during the probe.

1. *December 4, 1986.* Operatives representing the DEA and the SIU met to plan an attempted "buy." Glover, an informant who was surreptitiously cooperating with the authorities, proceeded to purchase cocaine at Nocella's residence, utilizing $650 in serialized funds supplied by the officers. A police surveillance was in place outside the house. Glover said he had spoken with both Nocella and one Howard Sylvia, but that it was Nocella who actually transacted the sale.

2. *December 10, 1986.* With surveillance in place, Glover, using an additional $300 in serialized funds, again bought cocaine at Jampsa Trail from Nocella and Sylvia.

3. *December 18, 1986.* A third buy, similar to the second, was accomplished. Thereafter, the SIU obtained a warrant from a state magistrate and searched the residence. Much to the troopers' disappointment, they discovered only a small amount of marijuana. Appellant was arrested, charged under state law with possession of marijuana, and read his rights. He boasted that he was good at his trade and told a trooper that he knew the search would take place. Two $100 bills, part of the listed currency used in that day's transaction, were found on his person. Shortly after the arrest, Nocella retained counsel in respect to the pending state charge. The task force's investigation continued.

4. *February 10, 1987.* Glover met with DEA agents and a state trooper. They outfitted him with a concealed recording device and provided $400 in seed money.

Glover went to Nocella's residence, but no purchase ensued. Nocella told Glover he was at risk; Glover would be killed if, as was suspected, he proved to be a turncoat. Nocella put it bluntly: "If you do ... narc me out ... I'll have your ... brains blown right straight out."

5. *March 16, 1987.* Another confidential source, Raoule Chasse, a/k/a Raoul Chase, advised the DEA that one Mike Stimans was distributing cocaine in the general vicinity of Candia, New Hampshire. Appellant was named as Stimans's supplier. The DEA believed Chasse's tale. Glover's cover being blown, the task force secured Chasse's agreement to cooperate and to wear a body wire.

6. *March 20, 1987.* A DEA agent gave Chasse $1,100 in serialized funds. Chasse arranged to meet with Stimans in a parking lot. Stimans's wife, Nancy, accompanied him. At the meeting, Chasse placed an order for cocaine and paid the money. The Stimanses left their customer in the parking lot and drove to Nocella's residence, tailed by task force personnel. They returned to the parking lot and delivered the cocaine to Chasse.

7. *April 3, 1987.* With surveillance again in place, an undercover officer, Welch, placed an order for cocaine and gave Stimans $4,100. He drove to Nocella's residence and returned once more with the drugs.

8. *May 5, 1987.* Chasse called Stimans and arranged for Welch to make a further buy on the following day. The DEA recorded the conversation.

9. *May 6, 1987.* Welch, Chasse, and Stimans met in the by-now-familiar parking lot. $4000 in serialized funds changed hands. The middleman proceeded to the general vicinity of Jampsa Trail. (In this instance, the attempted surveillance was less than a complete success.) He later rejoined Welch at a prearranged spot, having in hand the contraband plus $300 worth of the serialized bills. At that point, he was arrested. Special agent Gerald Graf-

fam of the DEA then obtained a search warrant from a federal magistrate. Graffam hit the jackpot: the search of appellant's house turned up 540.5 grams of cocaine, approximately $61,000 in currency (including serialized funds used in previous controlled purchases), handguns, and assorted drug-related paraphernalia.

Following these events, the instant indictment was returned.

## II. THE SIXTH AMENDMENT CHALLENGE

Before trial, Nocella moved in limine to bar the prosecution from using the tape recording made during Glover's February 10 visit, or the fruits thereof, on the ground that the surreptitious recording of the conversation out of the presence of appellant's lawyer infringed defendant's sixth amendment right to counsel. This argument prescinded from the convergence of four circumstances: Nocella's December 1986 arrest, the attendant state possession of marijuana charge, retention of counsel in that case, and the continued pendency of the state charge when Glover came to call.[1] The district court found appellant's contention to be meritless. So do we.

The right to counsel in a criminal case is of constitutional stature. It exists to insure that the accused not be left irretrievably to his own devices, without legal help when the heavy artillery of prosecutorial power is brought to bear. *Moran v. Burbine,* 475 U.S. 412, 430, 106 S.Ct. 1135, 1146, 89 L.Ed.2d 410 (1986). Once a person stands formally accused of a crime, he is vulnerable to certain " 'critical' stages in the criminal justice process 'where the results might well settle the accused's fate and reduce the trial itself to a mere formality.' " *Maine v. Moulton,* 474 U.S. 159, 170, 106 S.Ct. 477, 484, 88 L.Ed.2d 481 (1985) (citations omitted). In order appropriately to safeguard the accused at such potentially decisive moments, the constitutional right to counsel inheres "at or after

1. On March 4, 1987—some three weeks after Glover captured appellant's comminatory comments on tape—the state charge was nol-prossed on condition that Nocella be "of good behavior" for the next ensuing twelve months.

the time that judicial proceedings have been initiated...." *Brewer v. Williams,* 430 U.S. 387, 398, 97 S.Ct. 1232, 1239, 51 L.Ed.2d 424 (1977). After the right has attached, it prohibits law enforcement personnel, and those acting in concert with them, from deliberate elicitation of statements from an accused in the absence of counsel. *See Massiah v. United States,* 377 U.S. 201, 204–07, 84 S.Ct. 1199, 1201–04, 12 L.Ed.2d 246 (1964). From that time on, the prosecutor and the police alike are constrained by an "affirmative obligation not to act in a manner that circumvents and thereby dilutes the protection afforded by the right to counsel." *Maine v. Moulton,* 474 U.S. at 171, 106 S.Ct. at 485.

In this case, the government admits that it deliberately instigated the February 10 meeting between Glover and Nocella, but contends that the confrontation was not designed to obtain incriminating statements *concerning the pending state marijuana charge,* and was therefore permissible. In the government's view, the crime of distributing (or conspiring to distribute) cocaine—a federal crime for which Nocella was being investigated, but for which he had not yet been indicted—was separate and distinct from the earlier state charge. An even sturdier wedge divides the intimidation charge, 18 U.S.C. § 1512(b)(3), from the marijuana count.

Predictably, appellant sees the mise-en-scene through a wider-angle lens: he claims that because the state charge and the February confrontation arose in the context of an ongoing, state-federal investigation of drug trafficking, his right to counsel—which had admittedly attached upon the bringing of the state charge—inhered to protect him from continued undercover investigation of the sort employed here and likewise barred the use of the evidence obtained in respect to any of the federal charges.

As a general rule, when a defendant's right to counsel has attached for one crime, he is not insulated against interrogation as to other crimes, notwithstanding the absence of counsel. *Moran v. Burbine,* 475 U.S. at 431, 106 S.Ct. at 1146–47; *Maine v.*

*Moulton,* 474 U.S. at 179–80, 106 S.Ct. at 489–90. *Moulton* illustrates the point. Because the authorities suspected an indicted defendant, Moulton, of scheming to slaughter a witness, they secured the agreement of his codefendant, Colson, to wear a body wire. During an ensuing conversation between the two (recorded for the officers' benefit), Moulton made incriminating statements about the theft for which he and Colson stood indicted. The Court held that the sixth amendment barred admission of those statements because there was deliberate elicitation of incriminating statements with regard to a pending charge, after the right to counsel had attached thereon:

> The police thus knew that Moulton would make statements that he had a constitutional right not to make to the[ ] agent prior to consulting with counsel.... By concealing the fact that Colson was an agent of the State, the police denied Moulton the opportunity to consult with counsel and thus denied him the assistance of counsel guaranteed by the Sixth Amendment.

*Id.* at 177, 106 S.Ct. at 488 (footnote omitted). But the Court plainly indicated that, as to other (uncharged) crimes, a different standard obtained: "Incriminating statements pertaining to other crimes, as to which the Sixth Amendment right has not yet attached, are, of course, admissible at a trial of those offenses." *Id.* at 180 n. 16, 106 S.Ct. at 490 n. 16 (dictum). As Justice Brennan explained:

> ... [T]o exclude evidence pertaining to charges as to which the Sixth Amendment right to counsel had not attached at the time the evidence was obtained, simply because other charges were pending at the time, would unnecessarily frustrate the public's interest in the investigation of criminal activities.

*Id.* at 180, 106 S.Ct. at 490. A few months later, Justice O'Connor wrote that *Moulton*

> made clear ... that the evidence concerning the crime for which the defendant had not been indicted—evidence obtained in precisely the same manner from the

identical suspect—would be admissible at a trial limited to those charges. *Moran v. Burbine,* 475 U.S. at 431, 106 S.Ct. at 1146–47.

Based on this precedent, we conclude rather easily that, even after the state marijuana charge was proffered, it was entirely proper for the task force to continue its investigation of defendant's suspected criminal involvement in other offenses, such as dealing harder drugs. *See Maine v. Moulton,* 474 U.S. at 178–80, 106 S.Ct. at 488–90; *Massiah v. United States,* 377 U.S. at 206–07, 84 S.Ct. at 1203–04. As we recently remarked, "to hold that a defendant's right to counsel for one crime creates a right to counsel for the prosecution of any other crime committed after indictment on the first crime would be essentially to immunize a defendant from further prosecution." *United States v. Batista,* 834 F.2d 1, 4 (1st Cir.1987). The Constitution, as we read it, does not require the administration of so potent a vaccine.

Inasmuch as the probe itself was unexceptionable, and the record is barren of evidence suggesting bad faith, there seems, on the face of things, no sound basis for blocking introduction of the tape recording in this case. It is crystal clear that the task force did not aspire pretextually to manipulate the continuing investigation so as to unearth admissions for use against Nocella in the state case. The defendant does not seriously contend the contrary, nor does he intimate that the state sought to introduce his February 10 admissions as evidence against him in connection with the earlier marijuana charge. Under *Moulton* and *Massiah,* such usage would, as the government concedes, clearly be prohibited. In February 1987, the task force's focus was exclusively on "new" crimes rather than on the "old" one. The admissions obtained were introduced only in connection with the trial of this indictment. Thus, unless some circumstance beyond the mere pendency of the state charge necessitates a ruling that the right to counsel had attached with regard to the *federal* case as early as February 10, appellant's argument must fail.

Though laboring mightily, the best appellant can do is to question whether the pending charge was so closely linked to, or inextricably intertwined with, the other suspected crimes that the sixth amendment protection which had attached to the former somehow carried over to the latter. We believe that the answer to this inquiry is to a large extent adumbrated by our recent opinion in *United States v. Batista, supra.* There, the defendant was indicted on state drug charges. While that indictment was still pending, federal drug charges were brought against him for subsequently-occurring conduct. *Batista,* 834 F.2d at 2–3. Like Nocella in this case, Batista argued that,

> since he had been indicted earlier on the state charges, his right to counsel attached then with respect to the *state* charges.... [and] since the *federal* crime for which he was convicted arose out of what he characterize[d] as a joint state-federal operation, his right to counsel also attached with regard to the federal charges as of the moment he was indicted on the *state* charges.

*Id.* at 4 (emphasis in original). Albeit in dicta, we rejected this plea, stating that, "even if the 'critical stage' of the state case had not passed by the time of the [federal arrest], appellant still was not entitled to counsel on the separate offense" for which he was later indicted. *Id.*

*Batista,* appellant tells us, is inapposite because in his case the joint state-federal task force bracketed the critical events in a temporal sense. He adverts to several facts: the federal and state authorities jointly embarked upon an investigation into the defendant's cocaine sales before the initial search occurred and before the state charge was brought; that investigation continued notwithstanding preferment of the state charge; the state case was in full flower when the task force, as a part of the ongoing investigation, arranged the uncounselled confrontation between Nocella and the government actor, Glover; both sets of charges involved appellant's suspected commerce in narcotics; and the same investigators ran the operation throughout. We deem these circumstanc-

es, individually and collectively, to be of little moment.

The fact that the state investigation was not separate from the federal investigation was plainly of no consequence. In *Moulton,* for example, a single agency—the Maine State Police—was involved, yet the Court indicated that, despite the earlier charges which the police had preferred against Moulton, the fruits of their further investigation would be admissible as evidence pertaining to other charges as to which the sixth amendment right to counsel had not yet attached. 474 U.S. at 180 & n. 16, 106 S.Ct. at 490 n. 16. What matters most is that, notwithstanding the pendency of the state charge, the government's objective in sending Glover to appellant on February 10 was legitimately concerned with the "new," not the "old"—and was, therefore, investigatory, not accusatory.

By the same token, the temporal overlapping of which Nocella complains does not cut any constitutional mustard. The crucial factor—common to this case and to *Batista*—is that the later-charged crimes were independent of, and distinct from, the earlier-charged crime. In *Batista,* we noted that the right to counsel had "attached only with regard to an entirely separate state offense, [and] did not require the presence of counsel during the investigation ... of a later unrelated federal offense." *Batista,* 834 F.2d at 5. The case at bar, we think, fits snugly with this integument, notwithstanding that here— unlike in *Batista*—federal and state actors cooperated in the second arrest. We elaborate briefly.

The fact that the joint investigation was concerned with "drug violations" does not erase the obvious differences between the state crime of marijuana possession and federal offenses involving threats to a witness and distribution of cocaine.[2] The distinctions between these sets of crimes are sufficiently pronounced as not to require exegetic comment. The intimidation charge is, of course, a completely different breed of cat, and the cocaine sales, though conceptually linked to the marijuana possession if broad rubrics like "drug-related" are employed, were to all meaningful intents and purposes distinct offenses. The crimes arose out of different nucleii of operative fact, necessitated proof of different elements, and occurred at different times. The state and federal offenses were not, in our judgment, so inextricably intertwined as to demand that they be treated as an impartible unit. Rather, they were scissile. And to ignore their separateness would, we suggest, be thrice wrong: wrong as a matter of law, wrong as a defilement of common sense, and wrong as needlessly "frustrat[ing] the public's interest in the investigation of criminal activities." *Maine v. Moulton,* 474 U.S. at 180, 106 S.Ct. at 490.

■ We hold unhesitatingly that the pendency of an indictment for one drug offense does not preclude the government, in the person of the same team of sleuths, from continuing to investigate the accused for separate and distinct drug offenses. If in the process the accused retains counsel on the earlier charge, he is not thereby immunized from questioning in the absence of his attorney as to other discrete offenses. Incriminating statements made by the suspect in the course of such a continued indagation, though deliberately elicited by law enforcement personnel, may be used against him on separate charges thereafter brought—charges as to which the constitutional right to counsel had not vested when the elicitation occurred. As the Court has taught: "The Sixth Amendment's intended function is not to wrap a protective cloak around the attorney-client relationship for its own sake any more than it is to protect a suspect from the consequences of his own candor." *Moran v. Burbine,* 475 U.S. at 430, 106 S.Ct. at 1146.

■ The proper size and shape of the right to counsel has been fashioned by the Court and we must cut our sample along the lines of those measurements. Once we

---

**2.** We note that in *Batista,* the original state charge (trafficking in cocaine) and the neoteric federal charge (possession of cocaine with intent to distribute) had a much greater degree of affinity. *See* 834 F.2d at 2–3 (describing charges).

do so, it becomes readily apparent that the breadth of the sixth amendment is not so vast as to enswathe this situation. We conclude that the record and the law support the district court's denial of the motion in limine. Nocella's constitutionally assured right to counsel was not abridged by the elicitation and use of the recorded admissions against him in connection with the federal charges which were eventually brought. *See Moran v. Burbine,* 475 U.S. at 431, 106 S.Ct. at 1146–47; *Maine v. Moulton,* 474 U.S. at 180 & n. 16, 106 S.Ct. at 490 n. 16; *United States v. Batista,* 834 F.2d at 4–5.

## III. LEGALITY OF THE SEARCH

Nocella also questions the sufficiency of the affidavit underbracing the federal search warrant. He claims that much of the information contained therein should have been excluded because it was stale, unreliable, and/or recklessly false. We review the district court's decision to uphold the warrant against these challenges only for clear error. *United States v. Aguirre,* 839 F.2d 854, 857 (1st Cir.1988); *United States v. Figueroa,* 818 F.2d 1020, 1024 (1st Cir.1987).

Search warrants may be issued upon a showing of probable cause. Nevertheless, the phrase speaks in terms of a relative, not an absolute, criterion: to constitute "probable cause," the government need not show the quantum of proof necessary to convict. *United States v. Figueroa,* 818 F.2d at 1023; *United States v. Miller,* 589 F.2d 1117, 1128 (1st Cir.1978), *cert. denied,* 440 U.S. 958, 99 S.Ct. 1499, 59 L.Ed.2d 771 (1979). The cause necessary to make a thing "probable" is determined under an objective standard. Therefore, an affidavit is sufficient when it "demonstrates in some trustworthy fashion the likelihood that an offense has been committed and that there is sound reason to believe that a particular search will turn up evidence of it." *United States v. Aguirre,* 839 F.2d at 857–58. "Probability is the touchstone...." *Figueroa,* 818 F.2d at 1023.

■ In determining whether the government has made a sufficient showing of probable cause, a reviewing court must examine the "totality of the circumstances," *see Illinois v. Gates,* 462 U.S. 213, 230, 103 S.Ct. 2317, 2328, 76 L.Ed.2d 527 (1983), and evaluate, *inter alia,* the veracity and reliability of any informants, and the basis of their knowledge. *See, e.g., United States v. Figueroa,* 818 F.2d at 1024; *United States v. Ciampa,* 793 F.2d 19, 22 (1st Cir.1986). A weakness in any one or more of the elements is not necessarily fatal to a finding of probable cause. Indeed, there is no hard-core checklist of independent factors, mechanistically to be applied. All of the relevant data should be used instead to illuminate "the common sense, practical question whether there is 'probable cause' to believe that the contraband or evidence is located in a particular place." *Gates,* 462 U.S. at 230, 103 S.Ct. at 2328. What matters, in the long run, is whether the issuing magistrate had a "substantial basis" for finding that probable cause was extant. *Id.* at 238–39, 103 S.Ct. at 2332–33.

In this case, the federal search warrant was issued on the basis of a lengthy affidavit subscribed and sworn to by Graffam. We have examined the affidavit carefully, and find that it was more than adequate. It comprises a painstakingly crafted account of how the DEA spotted, and zeroed in on, a major drug dealer. As to both form and substance, the affidavit is a shining example of the genre. Thus, we need look but briefly at appellant's chief complaints.

■ *A. Staleness.* Nocella claims that Graffam's conclusion about his role in narcotics trafficking was unsubstantiated by actual convictions and that the information upon which it rested was too old. That, we suggest, is wishful thinking. To be sure, data going back to 1984 was included, but merely as background. As Graffam spelled out in considerable detail, three times in the two week period from December 4–18, 1986, Glover entered Nocella's residence with marked money and without contraband, and each time returned with the cocaine and without the cash. He named Nocella as the source. When arrested on December 18, appellant was

carrying some of the serialized currency.[3] His vengeful threats to Glover, recorded on tape and thus virtually irrefutable, themselves evidenced his involvement in drug trafficking. And the sales in the spring of 1987 showed persuasively that defendant's criminal activity was velivolant.[4] As to the absence of prior convictions, past events can convincingly convey continuing criminality despite the fact that a particular suspect has not theretofore stood in the dock and been adjudged guilty. Although continued involvement in drug dealings as evidenced by a string of narcotics convictions might have bulwarked the affidavit, such added facts, in this case, would have been tantamount to the shipment of coals to Newcastle.

By its very nature, drug trafficking, if unchecked, is apt to persist over relatively long periods of time. *See United States v. Angulo–Lopez*, 791 F.2d 1394, 1399 (9th Cir.1986). We agree with the Fifth Circuit that a "primary consideration in evaluating the staleness issue is whether the affidavit describes a single transaction or a continuing pattern of criminal conduct." *United States v. Tucker*, 638 F.2d 1292, 1299 (5th Cir., Unit A), *cert. denied*, 454 U.S. 833, 102 S.Ct. 132, 70 L.Ed.2d 111 (1981); *see also United States v. Gann*, 732 F.2d 714, 722 (9th Cir.), *cert. denied*, 469 U.S. 1034, 105 S.Ct. 505, 83 L.Ed.2d 397 (1984). That is particularly true in the shadowy world of drug dealings. Under all the circumstances, Graffam's affidavit, fairly read, contained more than enough fresh grist for the probable cause mill.

■ B. *Stimans's Sales.* Appellant also disputes that trafficking on his part was properly inferable from the three controlled purchases of cocaine made during the period March 20, 1987 through May 6,

1987. Appellant claims that these incidents do not implicate him because no one actually observed funds and drugs being exchanged within the dwelling on Jampsa Trail.

We need not loiter long over this specious argument. On each occasion, Stimans, usually accompanied by his wife, took the marked money, went directly to Nocella's residence (or, on one occasion, to its general vicinity), and returned with the desired quantity of cocaine. Stimans told Chasse that "Doc" was the source of the cocaine—and Graffam verified that "Doc" was Nocella's nickname. On February 10, when appellant warned Glover about the pains and penalties of disloyalty, he mentioned that Stimans (or someone whose name sounded the same) "had already been looking for [Glover]." Affidavit at 8. On top of these tidbits, the inference which Graffam drew was altogether permissible from the transactions alone. It strains credulity to think that the long arm of coincidence is so elastic as to reach to the extremes postulated by the defendant. The law is not so struthious as to compel the constable—or a magistrate, for that matter—to ignore the obvious.

We need not paint the lily. It was altogether reasonable for the magistrate to conclude from the contents of Graffam's affidavit that Nocella was deeply (and culpably) implicated in Stimans's cocaine sales.

■ C. *Reliability of Informants.* Nocella questions the reliability of both Glover and Chasse. In Glover's case, for example, he makes much of the fact that no cocaine was found during the December 18, 1986 search of Nocella's residence. *See supra* note 3. This, by implication, calls

---

**3.** Appellant argues that because the state officers' December 18 search turned up nothing noteworthy, apart from a few marijuana cigarettes, a reasonable person would be justified in concluding that the alleged purchases never occurred. We are unconvinced. Aside from the mountain of other evidence, Glover was searched for narcotics before each visit to Jampsa Trail, and for serialized funds afterwards. In addition to these checks and balances, the discovery of the marked money in Nocella's pos-

session and his statements to the trooper, *see supra* at 34, were evidence enough of Nocella's likely involvement. *See United States v. Figueroa*, 818 F.2d at 1024. Tipsters, after all, need not "be letter perfect in every particular." *Id.* (citation omitted).

**4.** We flatly reject the claim that Stimans's activity was unconnected to Nocella. We discuss our reasons in Part III(B), *infra*.

into question Glover's reliability, appellant argues, and is the loose end which leads the fabric of probable cause to unravel. Yet it is clear from Graffam's affidavit that there was independent corroboration of the truth of much of the information which Glover provided. To some extent, his version of the facts was buttressed out of Nocella's own mouth on February 10. Chasse, of course, cross-corroborated the gist of what Glover had learned. And three other confidential sources offered pieces of information which fell neatly into place in the Glover-painted scenario.

It is in the nature of things that informants are often less than pillars of the community, but that truism does not render their insights *ipso facto* undependable. Graffam, an investigator for some fifteen years, was steeped in the drug trade and in the ways of the underworld. He took appropriate precautions. In the end, he had adequate reason to trust—and to act upon —what Glover had said. The magistrate, too, had sufficient cause to find that giving such credence to Glover's account, under the circumstances at bar, was not unreasonable.

The case as to Chasse is clearer still. He had previously provided information about drug dealers which Graffam, upon independent investigation, had found to be accurate. He wore a body wire during some of his meetings with Stimans, and the resultant tapes bore out the information which he supplied. Welch, a state trooper, corroborated Chasse's account at key points. It was no mistake to rely on an informer in these circumstances.

## IV. CONCLUSION

We need go no further. The criminal justice system is designed, in part, to spare the innocent (or those whose guilt cannot satisfactorily be proven). It is, however, equally designed to snare the guilty. The jury found appellant to be a person justly accused. Our scrutiny of the record bears out that Nocella was one. Because he was fairly tried and duly convicted, and because his several claims of error are unavailing, the judgment below will be

*Affirmed.*