# United States Court of Appeals
## For the First Circuit

No. 21-1165

UNITED STATES OF AMERICA,

Appellee,

v.

DROEL JARED ENCARNACION,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Allison D. Burroughs, U.S. District Judge]

Before

Lynch and Selya, Circuit Judges,
and McConnell,* District Judge.

Murat Erkan, with whom Erkan & Associates was on brief, for appellant.
Karen L. Eisenstadt, Assistant United States Attorney, with whom Nathaniel R. Mendell, Acting United States Attorney, was on brief, for appellee.

February 18, 2022

---

* Of the District of Rhode Island, sitting by designation.

**SELYA**, <u>Circuit Judge</u>.  Defendant-appellant Droel Jared Encarnacion challenges his convictions for certain drug-trafficking offenses.  In support, he questions the propriety of the wiretap that led to his apprehension, the district court's handling of the juror-selection process, and two of the court's evidentiary rulings.  Concluding, as we do, that the defendant is tilling barren soil, we affirm.

## I

We begin by rehearsing the facts and travel of the case.  On August 2, 2018, Michael Patterson, a local police officer delegated to work as part of a Drug Enforcement Administration (DEA) task force, sought and received authorization from the district court to intercept wire and electronic communications associated with identified telephone numbers linked to suspected drug-traffickers, including Robin Martinez Suazo (Suazo).  Suazo was no stranger to the DEA:  he had come to its attention during an earlier drug-trafficking probe.

Before seeking this wiretap authorization, the government had conducted its investigation through the use of a variety of techniques.  It had come to believe that Suazo regularly sought to import narcotics into Massachusetts.  It had, however, made only limited progress in discovering the wider parameters of his drug-trafficking activities and the structure of his network.

The wiretap on Suazo's telephone quickly bore fruit.[1] On five separate dates in August and September of 2018, the DEA intercepted calls between Suazo and a man subsequently identified as the defendant. During the first four calls, the pair discussed prices, quantities, and varieties of narcotics, frequently using guarded terms and references (e.g., "blue ones," "white"), but sometimes being more explicit. In one such call, Suazo sketched a scenario in which a third party would purchase drugs in Utah (a "border zone" where prices were low) and resell them for more money in the Boston market. That paradigm was echoed in the last of the intercepted calls: the defendant, who was in Salt Lake City, told Suazo that he had rescheduled his flight because "the guy who was going to give me the thing is going to give it to me today." He added that "I have the money on me to buy the thing and I even have the suitcases and all my things here, to buy it, send it and go straight to the airport." In the course of that call, Suazo reminded the defendant of the lucrative prices for which the drugs could be resold in the Boston area. Because prices were subject to fluctuation, there was some urgency to the deal: in Suazo's words, "We have to put a couple pesos in our pocket, man, quickly."

---

[1] On the intercepted calls, Suazo and the defendant spoke in Spanish. Translations were procured, and English-language transcripts were used at trial.

- 3 -

A few hours after this call ended, the defendant boarded a red-eye flight to Boston. When he arrived early the next morning, he rented a car and drove to a house at 645 Fellsway West in Medford, Massachusetts. He entered the house and — later that morning — a Federal Express package was delivered. On the same day, the defendant drove to East Boston and picked up Suazo. While the two men were driving, DEA agents stopped their vehicle. The unopened Federal Express package was on the floor in the front seat. The shipping label indicated that it had been shipped by "Droel Encarnacion" in Utah to "Elisida Figueroa" at the Fellsway West address.[2] When opened, the package was found to contain 427.3 grams (slightly less than a half kilo) of cocaine. Suazo and the defendant were arrested on the spot.

On November 7, 2018, a federal grand jury sitting in the District of Massachusetts returned an indictment that, as relevant here, charged the defendant with conspiracy to possess cocaine with intent to distribute, see 21 U.S.C. § 846, and possession of cocaine with like intent, see id. § 841(a)(1). During pretrial proceedings, the defendant moved to suppress the fruits of the wiretap. The district court denied his motion and, in due season, a three-day jury trial ensued. The jury found the defendant guilty

---

[2] Subsequent investigation revealed that Elisida Figueroa is the defendant's mother.

on both of the charged counts, and the district court thereafter sentenced him. This timely appeal followed.

## II

On appeal, the defendant advances four claims of error. We deal with those claims sequentially.

## A

The defendant argues that the wiretap should not have been authorized and that, therefore, the district court erred in denying his motion to suppress. To put this argument in perspective, some background is useful.

Through the enactment of Title III of the Omnibus Crime Control and Safe Streets Act of 1968 (Title III), 18 U.S.C. §§ 2510-2522, "Congress authorized wiretapping as needed to allow effective investigation of criminal activities while at the same time ensuring meaningful judicial supervision and requiring specific procedures to safeguard privacy rights." United States v. Gordon, 871 F.3d 35, 43 (1st Cir. 2017). To that end, Title III sets out specific showings that must be made to obtain judicial authorization for a wiretap. See 18 U.S.C. § 2518(3).

At the outset, the government must adduce facts showing probable cause to believe that a particular defendant is linked to a particular crime. See id. § 2518(3)(a). It must then adduce facts sufficient to support "probable cause for belief that particular communications concerning that offense" are likely to

- 5 -

be obtained through the desired wiretap.  Id. § 2518(3)(b).  Next, the government must show that either the individual or the offense is sufficiently connected to the means of communication that it seeks to surveil.  See id. § 2518(3)(d).  Finally, the government must make a showing of necessity, that is, a showing that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous."  Id. § 2518(3)(c).

In this instance, the defendant premised his motion to suppress on two theories.  He alleged, first, that the wiretap application was insufficient because the facts supporting the initial probable-cause showing were stale and unreliable.  Second, he alleged that the wiretap application was insufficient because the government had not made an adequate showing of necessity.

The district court found neither theory persuasive, and the defendant now reprises them on appeal.  Our standard of review is familiar.  When reviewing a district court's denial of a motion to suppress wiretap evidence, we assay its factual findings for clear error and its legal conclusions de novo.  Gordon, 871 F.3d at 43.  In conducting this tamisage, we must determine whether the application was at least "minimally adequate" to support the authorization of the wiretap.  Id. (quoting United States v. Santana, 342 F.3d 60, 65 (1st Cir. 2003)).

**1**

We start with the defendant's challenge to the adequacy of the probable-cause showing. It is common ground that information in an affidavit supporting a wiretap application must be timely, not stale. See, e.g., United States v. Schaefer, 87 F.3d 562, 568 (1st Cir. 1996). Information is stale if, for example, "it established probable cause at some point in the past but does not support probable cause at the time of the warrant's issuance." United States v. McLellan, 792 F.3d 200, 210 (1st Cir. 2015).

Just as different kinds of produce will retain their freshness for varying periods, the timeliness of probable cause is context-dependent and will vary both with the nature of the information itself and with the nature of the suspected offense. See United States v. Morales-Aldahondo, 524 F.3d 115, 119 (1st Cir. 2008). Thus, "[w]hen evaluating a claim of staleness, we do not measure the timeliness of information simply by counting the number of days that have elapsed." Id. "Instead, we must assess the nature of the information, the nature and characteristics of the suspected criminal activity, and the likely endurance of the information." Id. Facts regarding an amorphous drug-trafficking enterprise, in which large-scale transactions may take weeks or months to mature, normally will have a longer shelf life. See Schaefer, 87 F.3d at 568 (observing that longer-running nature of

drug-trafficking conspiracies makes it more likely that "a datum from the seemingly distant past will be relevant to a current investigation"); United States v. Nocella, 849 F.2d 33, 40 (1st Cir. 1988) (noting that "drug trafficking, if unchecked, is apt to persist over relatively long periods of time" so that the shelf life of facts supporting probable cause may be longer).  This shelf life sometimes may be extended when the application describes an ongoing pattern of conduct in the drug-trafficking arena, see Nocella, 849 F.2d at 40, because the probable cause determination will not hinge on discrete pieces of standalone evidence but, rather, on the totality of the circumstances, see United States v. Anzalone, 923 F.3d 1, 5 (1st Cir. 2019) (citing District of Columbia v. Wesby, 138 S. Ct. 577, 588 (2018)).

In this case, the information supporting probable cause in the wiretap application included the following:

- Early in 2017, an alias ("Jevito") used by Suazo was mentioned on intercepted calls during a six-month wiretap of an international drug-trafficking organization regarding shipments of drugs from Mexico to the United States; and a telephone number used by Suazo was identified as participating in multiple coded conversations about importing drugs from Mexico into the United States.

- On August 8, 2016, a source of information (SOI-1) identified "Jevito" as a high-level cocaine dealer in Massachusetts.[3]  SOI-1 indicated that "Jevito" was his/her supplier for bulk cocaine and provided a telephone number that was later identified as having once belonged to Suazo.

- On December 27, 2017, a second source of information (SOI-2) identified "Jevito" as an individual living in Chelsea, Massachusetts, who had once supplied him/her with 200 grams of fentanyl.  SOI-2 gave law enforcement a photograph of Suazo, identifying him as the man he/she knew as "Jevito" and confirmed that the target telephone number belonged to "Jevito."

- In March of 2018, another source of information (SOI-4) confirmed that "Jevito" lived in Chelsea, identified as "Jevito's" several telephone numbers used by Suazo, and (when describing "Jevito") accurately described Suazo's physical appearance. SOI-4 also vouchsafed that "Jevito" could move substantial quantities of cocaine and heroin/fentanyl in the Boston area.

---

[3] Our numerical references to informants (e.g., "SOI-1") track those employed by the district court.

- In April of 2018, SOI-4 introduced "Jevito" to another target of the investigation and brokered a sale of a kilogram of fentanyl between the two. "Jevito" and the second target conducted the transaction in Chelsea on May 1, 2018, and "Jevito" agreed to pay $50,000 for the drugs within the next fifteen days. Telephone records and visual surveillance corroborated SOI-4's narrative of the transaction, and agents proceeded to recover a kilogram of fentanyl.

- On July 17, 2018, another source of information (SOI-3) identified "Jevito" as a leader in a drug-trafficking organization based in Chelsea, which was selling ten to fifteen kilograms of cocaine, heroin, and fentanyl biweekly. Although SOI-3 had not spoken to "Jevito" for roughly seven months, SOI-3 had known "Jevito" for most of his/her life and "Jevito" (he/she said) had been dealing drugs for approximately twenty years.

- In the same time frame, SOI-3 identified a Chelsea address associated with "Jevito," which cell phone data later confirmed was an address where Suazo had been.

- Telephone records and pen register data reviewed by government agents prior to the wiretap application showed that the telephone number believed to be associated with Suazo had been used to contact several suspected drug dealers over a substantial period (up to July 20, 2018).

To be sure, the bits and pieces of information garnered by the government do not comprise a seamless narrative. Moreover, the defendant notes a number of small inconsistencies in the government's proffer. But seamless narratives are not the stuff of wiretap applications, and to hold that these relatively small inconsistencies undermine the district court's probable cause determination would require us to overlook the forest for the trees. Taken in the aggregate, the information contained in the wiretap application told a convincing tale of ongoing drug-trafficking activity with Suazo front and center. The whole is sometimes greater than the sum of the parts and — viewed with an eye towards the ongoing conspiracy — the information was not stale. It clearly established Suazo's long-term engagement in the wholesale drug trade in and around Boston — an engagement that persisted up until the weeks immediately preceding the wiretap application. The facts adduced by the government were timely and more than "minimally adequate," Gordon, 871 F.3d at 43, to support probable cause for belief both that Suazo was continuing to engage

in the drug trade and that electronic monitoring would advance the investigation of his nefarious activities.

**2**

This brings us to the defendant's contention that the government failed to establish necessity for the wiretap. We approach this contention mindful that "wiretapping is to be distinctly the exception — not the rule." United States v. Hoffman, 832 F.2d 1299, 1307 (1st Cir. 1987).

Title III's necessity requirement is designed to ensure that the government makes a good-faith effort to exhaust other, less intrusive investigative means before seeking to employ a wiretap. See Gordon, 871 F.3d at 45. The government, though, must not be held to an unrealistic standard:  its explanation of investigative avenues taken and those left unexplored "must be viewed through the lens of what is pragmatic and achievable in the real world." Id.; see United States v. Uribe, 890 F.2d 554, 556 (1st Cir. 1989) (noting need for "practical, commonsense approach"). When all is said and done, an adequate showing of necessity "should demonstrate that the government has made a reasonable, good faith effort to run the gamut of normal investigative procedures before resorting to means so intrusive as electronic interception of phone calls." Gordon, 871 F.3d at 46 (quoting United States v. Martinez, 452 F.3d 1, 4 (1st Cir. 2006)).

To carry this burden, the government is "not required to show that other investigatory methods have been completely unsuccessful." United States v. Rivera-Rosario, 300 F.3d 1, 19 (1st Cir. 2002). By the same token, the government need not either "run outlandish risks or [] exhaust every conceivable alternative before resorting to electronic surveillance." Id.; see Santana, 342 F.3d at 65. Given these parameters, it is readily apparent that the necessity analysis demands a "context-specific" focus. Gordon, 871 F.3d at 46.

This context-specific focus is especially apt where, as here, an investigation centers on a sprawling drug-trafficking network. We have noted before that "drug trafficking is inherently difficult to detect and presents formidable problems in pinning down the participants and defining their roles." United States v. Santana-Dones, 920 F.3d 70, 76 (1st Cir. 2019) (quoting United States v. David, 940 F.2d 722, 728 (1st Cir. 1991)). As a result, "investigative personnel must be accorded some latitude in choosing their approaches." Id.

Moving from general principles to the specific circumstances of this case, the defendant first suggests that the government's investigative goals were overly broad and impermissibly vague.[4] At first blush, the goals of the

_____

[4] The government's wiretap application stated that the overarching goal of the investigation was "establishing the full

- 13 -

investigation appear to be in step with investigative goals that we have approved in the past. See, e.g., Santana-Dones, 920 F.3d at 78 (approving goals including "discovering the sources, delivery means, storage locations, and distribution methods for the narcotics; locating resources used to finance the trafficking; and determining how the conspiracy invested and laundered their drug proceeds"); United States v. Villarman-Oviedo, 325 F.3d 1, 10 (1st Cir. 2003) (approving wiretap authorization when investigative goals involved "uncovering the full scope of the potential crimes under investigation, as well as the identities of those responsible for the unlawful manufacture, possession, sale and distribution of narcotics in Puerto Rico" and "obtaining evidence of the totality of offenses in which the targets of the investigation were involved"). The district court did not speak to this point, and we need not address it here: in the court below, the defendant suggested that the goals of the investigation were too broad and too vague only in a footnote in his memorandum

---

scope and nature of the criminal activities of [Suazo and the other targets] and others yet unknown and their criminal associates." The government then gave content and texture to this general goal by enumerating a series of more specific ones, including identifying suppliers; identifying redistributors and other downstream associates; identifying individuals who were assisting the targets in collecting and laundering drug proceeds; identifying locations used in furtherance of the targets' drug-trafficking activities; determining sources of illicit financing and the disposition of drug-trafficking proceeds; and illuminating drug-trafficking methods.

in support of his motion to suppress.  Given this glancing reference, unaccompanied by any developed argumentation, we deem this claim waived.  See Teamsters Union, Local No. 59 v. Superline Transp. Co., 953 F.2d 17, 21 (1st Cir. 1992) ("If any principle is settled in this circuit, it is that, absent the most extraordinary circumstances, legal theories not raised squarely in the lower court cannot be broached for the first time on appeal.").

The defendant's next line of argument is that a wiretap was not necessary because, after the May 1 transaction, the government "had already achieved one of the goals of the investigation — identifying an individual supplying drugs to Suazo."  This argument takes too myopic a view of the necessity requirement.  Although the government may have had enough information to indict and convict Suazo and one of his suppliers after it learned of the May 1 transaction, the government had ample reason to believe that there were more foxes in the henhouse.  The government is not required to abjure wiretapping and terminate an investigation once it has satisfied a limited subset of its investigative goals.  See Santana-Dones, 920 F.3d at 77 (explaining that the necessity inquiry "does not hinge on whether it already has garnered enough goods to pursue criminal prosecution").  Indeed, the defendant concedes that there is "no obligation to arrest an individual as soon as probable cause to arrest ripens."

Here, moreover, the government explained that the supplier in the May 1 transaction, which had been brokered by SOI-4, was not one of Suazo's regular suppliers. Consequently, the transaction shed little light either on Suazo's overall operations or on his working network of drug suppliers. Arresting Suazo at that juncture would likely have driven his associates underground. So viewed, we think that the government sufficiently explained why its investigation should not have been concluded following the May 1 transaction.

Relatedly, the defendant argues that the government was required to try a laundry list of less intrusive investigative methods before seeking a wiretap. As to each of these proposed methods, the government offered specific and reasonable explanations why that method (alone or in combination with others) would have been unproductive, too dangerous, or insufficient to achieve its investigative goals.[5] What is more, the government made a cogent showing that less intrusive investigative techniques — such as direct surveillance by law enforcement, use of

---

[5] An example may be helpful. The defendant complains that investigators "did not even attempt to use surveillance cameras" or execute search warrants. The government, however, plausibly explained — in its wiretap application — why surveillance cameras would have been of limited utility in gathering information about the operation of the conspiracy. So, too, it paused and explained that executing search warrants for locations associated with Suazo would have been "premature" and likely to alert other members of the conspiracy to the ongoing investigation.

confidential informants, interviews with cooperating defendants in other cases, and review of phone and text records retrieved from providers — had taken the investigation about as far as it could go.

In sum, the wiretap application contained reasonable investigative goals, and the government plausibly explained why traditional means of investigation, including those it had already attempted, were insufficient to achieve the stated goals of the investigation. On this record, the district court's finding that the government's showing of necessity was adequate easily passes muster.

**B**

The defendant's next claim of error implicates the jury-selection process. He asserts that the district court abused its discretion in striking for cause a juror who stated during voir dire that she was a proponent of "defunding the police." The government defends the district court's ruling and argues, in any event, that the defendant suffered no prejudice. See, e.g., United States v. Brooks, 175 F.3d 605, 606 (8th Cir. 1999) ("Even if the district court abused its discretion in striking [two prospective jurors] for cause, [the defendants] would not be entitled to a reversal of their convictions because they failed to show the jurors who tried their case were biased against them.").

We review a district court's decision to strike a potential juror for abuse of discretion. United States v. Sampson, 486 F.3d 13, 39 (1st Cir. 2007). Because the district court has the benefit of observing and interacting with potential jurors, we cede substantial deference to that court in assessing potential juror bias. See United States v. Gonzalez-Soberal, 109 F.3d 64, 69 (1st Cir. 1997). "There are few aspects of a jury trial where we would be less inclined to disturb a trial judge's exercise of discretion, absent clear abuse, than in ruling on challenges for cause in the empanelling of a jury." United States v. McCarthy, 961 F.2d 972, 976 (1st Cir. 1992).

The very "purpose of a jury is to guard against the exercise of arbitrary power." Taylor v. Louisiana, 419 U.S. 522, 530 (1975). That purpose is best served when the jury reflects a representative cross-section of the community, free from preconceived viewpoints. See id. It follows that fairness is the sine qua non for jury service: the jury must be "capable and willing to decide the case solely on the evidence before it." McDonough Power Equip., Inc. v. Greenwood, 464 U.S. 548, 554 (1984) (quoting Smith v. Phillips, 455 U.S. 209, 217 (1982)). The voir dire process helps to control for this concern "by exposing possible biases, both known and unknown, on the part of potential jurors." Id. "Demonstrated bias in the responses to questions on voir dire may result in a juror being excused for cause." Id.

The defendant contends that the district court improperly struck a juror for cause due to the juror's political belief about "defunding the police." In the defendant's view, the juror's comment reflected merely a principled skepticism about police testimony — not bias. This contention, though, reads the record through rose-colored glasses.

The critical voir dire exchange took place after the juror had expressed her sentiments about "defunding the police":

> THE COURT: I need to push you a little bit more on the answer, whether or not you have reservations about your ability to listen fairly to law enforcement testimony or you're confident you just can listen to it fairly and can make an independent evaluation based on that testimony.
> THE JUROR: I guess I do have slight reservations. I can't say for sure. Sorry.

Following this response, the court ruled that because the juror "had expressed a reservation about her ability to be fair," it would be necessary to excuse her for cause.

When a juror cannot assure the court and the parties that she will be fair, that juror should not be allowed to serve. Here, the juror in question expressed doubt about her ability to be fair. See, e.g., McDonough Power Equip., 464 U.S. at 554; Sampson v. United States, 724 F.3d 150, 165 (1st Cir. 2013). It was, therefore, comfortably within the encincture of the district court's discretion to strike the juror for cause.

Contrary to the defendant's importunings, the fact that the juror described her reservations as "slight" does not change the calculus in any material way. Fairness is so central to the jury system that a juror's sincerely expressed doubts about her ability to be fair, even if slight, must be taken seriously. Except, perhaps, in the most extraordinary circumstances — not present here — doubts about fairness will always tilt in favor of disqualification.

In an effort to blunt the force of this reasoning, the defendant suggests that the district court should have drilled down more deeply. He also suggests that the court was more searching when questioning other members of the venire. Even if such considerations are relevant to the question of whether the court abused its discretion in removing for cause a juror who had expressed reservations about her ability to be fair (a matter on which we take no view), they are of no help to the defendant in this case. The court's questioning of the juror was sufficient to raise a legitimate fairness concern,[6] and the record lends no

---

[6] The district court's explanation, given in connection with defense counsel's objection to the removal of the juror for cause, is informative:

> There are plenty of jurors that expressed various reservations about the legal system, their views about people that use drugs, their views about drug dealers. And any of those people, if they said they could be fair, they were kept on the jury irrespective of what those views were. [This juror, though,]

- 20 -

credible support to the intimation that the district court applied some unique standard to the juror in question. Our review of the jury-empanelment transcript confirms that the court treated prospective jurors even-handedly in all relevant respects.

That ends this aspect of the matter. There is simply no principled way — on this record — to hold that the district court abused its wide discretion in removing the juror for cause.[7] We therefore reject the defendant's second claim of error.

## C

The defendant's third claim is a claim of evidentiary error: he submits that the district court abused its discretion in admitting expert testimony from a DEA group supervisor, Mark Tully. Although Agent Tully had not himself participated in the investigation, the government introduced his testimony concerning the meaning of coded language used in recorded calls between Suazo and the defendant.

Prior to trial, the defendant moved in limine to block Agent Tully from giving testimony. The district court denied his motion, ruling that it would admit the testimony as long as the government laid a proper foundation. At trial, that foundation

---

expressed reservations about her ability to be fair.

[7] Because we find no error, we need not consider the government's back-up argument that the striking of the juror caused the defendant no prejudice.

was laid. And when the government presented Agent Tully as an expert, the defendant's counsel stated that he had "no objection."

In this venue, the defendant suggests that the district court gave unconditional approval to Agent Tully's expert testimony and, thus, he did not need to object at trial. We do not agree. Taken in context, we think that the district court's order was conditional thus requiring the defendant to raise any specific objections that he might have during Agent Tully's testimony. Even so, the defendant did not object to Agent Tully's qualification as an expert during his testimony.

Ordinarily, a defendant must object to particular evidence at trial in order to preserve his appellate rights. See, e.g., United States v. Noah, 130 F.3d 490, 496 (1st Cir. 1997). But when a defendant raises such an objection before trial by a motion in limine and the district court's rejection of the defendant's position is unconditional, the defendant's objection may be deemed preserved even if not raised again at trial. See United States v. Grullon, 996 F.3d 21, 30 (1st Cir. 2021); United States v. Almeida, 748 F.3d 41, 50 (1st Cir. 2014). Here, however — as we have explained — the ruling was conditional, and no contemporaneous objection was interposed during Agent Tully's testimony. It follows that the arguments made by the defendant on appeal with respect to Agent Tully's testimony engender only plain error review. See Almeida, 748 F.3d at 50. "Review for plain

error entails four showings: (1) that an error occurred (2) which was clear or obvious and which not only (3) affected the defendant's substantial rights, but also (4) seriously impaired the fairness, integrity, or public reputation of judicial proceedings." United States v. Duarte, 246 F.3d 56, 60 (1st Cir. 2001).

With this preface, we turn to the defendant's claim of error. It rests on two grounds. First, he says that Agent Tully should not have been allowed to testify as an expert because his methodology was unreliable. Second, he says that Agent Tully should not have been allowed to testify as an expert because the communications that he purposed to interpret consisted of "plain, uncoded language" and, thus, expert testimony was unnecessary. Neither ground withstands scrutiny.

As a starting point, we note that the defendant does not challenge Agent Tully's qualifications as an expert, his knowledge of the arcane world of drug distribution, or his wide experience in drug-trafficking investigations. Nor does he gainsay our repeated approval of the use of expert testimony, given by veterans of narcotics investigations, to explain the meaning of "coded" language in drug-related communications. See, e.g., United States v. Henry, 848 F.3d 1, 12 (1st Cir. 2017); United States v. Santiago, 566 F.3d 65, 69 (1st Cir. 2009); Hoffman, 832 F.2d at 1310. Such testimony is often helpful because in "a rough-and-

ready field" such as drug distribution, "experience is likely the best teacher." Hoffman, 832 F.2d at 1310 (approving expert qualification of veteran DEA officer on drug-trafficking codes and jargon).

The defendant nonetheless argues that Agent Tully's methodology was flawed. That methodology was unreliable, he says, because it was "self-validating": as he envisions it, Agent Tully reverse-engineered his testimony to fit the facts revealed at subsequent stages of the conspiracy. Stripped of rhetorical flourishes, this argument is composed of little more than smoke and mirrors. We explain briefly.

When interpreting recorded conversations, Agent Tully frequently would be able to narrow coded language to a range of possible meanings. He would then determine the precise meaning of the coded language based, in part, on what drugs had later been seized. That was not reverse-engineering but, rather, a common sense way of isolating the precise meaning of a coded term.

Agent Tully gave the district court a helpful illustration of how his methodology worked. He referred to an earlier investigation in which suspected co-conspirators discussed "palomas" and "palomitas," each consisting of "four white doves." Only after the contraband (four-ounce packages of cocaine) had been seized could the precise meaning of "paloma" and "white dove" be ascertained.

The case at hand, Agent Tully indicated, was analogous. Kilos of "white stuff," mentioned in the recorded calls, might refer either to cocaine or fentanyl (both drugs in which Suazo allegedly trafficked). Without further information — such as was provided by an actual seizure — Agent Tully could not pinpoint which drug was being discussed. When cocaine was seized, the meaning became evident.

Viewed against this backdrop, the defendant's objection crumples. Context often informs interpretive judgments, and there is nothing problematic about an expert's methodology aligning with common sense. Mindful of the wide variety of matters on which expert testimony may be useful, Federal Rule of Evidence 702 demands that the inquiry into an expert's methodology must be tailored to fit the circumstances of each particular case. See Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 594 (1993) ("The inquiry envisioned by Rule 702 is, we emphasize, a flexible one."). Especially outside of scientific fields, factors bearing on the reliability of an expert's methodology will vary. See Kumho Tire Co. v. Carmichael, 526 U.S. 137, 150 (1999) (noting that because there are "many different kinds of experts, and many different kinds of expertise," the factors relevant to the reliability inquiry will vary). The methodology used by Agent Tully was not beyond the pale. In point of fact, that methodology

is strikingly similar to methodologies that we have deemed reliable in other cases. See, e.g., Henry, 848 F.3d at 12.

In a variation on this theme, the defendant argues that the subject matter of Agent Tully's testimony was such that it did not allow for any expert testimony at all. As was true of his "methodology" argument, this dog will not hunt.

We agree, of course, that a party should not be allowed to confer the imprimatur of expertise upon interpretations of evidence that jurors need no assistance in understanding. See United States v. Valdivia, 680 F.3d 33, 51 (1st Cir. 2012) (explaining that when "expert testimony on a subject is 'well within the bounds of a jury's ordinary experience,' the risk of unfair prejudice outweighing probative value is not improbable" (quoting United States v. Montas, 41 F.3d 775, 784 (1st Cir. 1994))). In this case, though, it was neither clear nor obvious error for the district court to conclude that the decisional scales tipped in favor of allowing expert testimony.

To begin, it was neither clear nor obvious error for the district court to find that expert testimony would be helpful to the jury in understanding the jargon used by Suazo and his confederates. For instance, when Suazo and the defendant discussed "blue ones" and "yellow ones," the Agent's expert testimony rendered those terms intelligible as, respectively, 30-milligram Percocet pills and 10-milligram Percocet pills. His expert

knowledge as to the color and strength of pills peddled by drug dealers in the New England market was helpful to the jury in understanding the recorded conversations.

We think, as well, that Agent Tully's expertise was helpful to the jury in explaining the nature of the transactions to which the coded terms related.  See Henry, 848 F.3d at 12 (upholding officer's expert testimony not directly related "obscure jargon" admissible because officer "drew upon his expertise in explaining the relevance of the communications in the drug trade"); United States v. Monell, 801 F.3d 34, 45 (1st Cir. 2015) (permitting expert testimony related to drug-dealer methods).  For example, Agent Tully was able to assist the jury in understanding the economics behind an intercepted discussion of the relative advantages of "pure" cocaine versus "cut" cocaine. Because a pure product can be cut without degrading its potency below marketable quality, more profit can be reaped from increasing marketable volume through the use of adulterants.  In contrast, a "cut" product yields profit mainly through price arbitrage between locations — "getting it here and selling it."  And, relatedly, Agent Tully was able to explain how discussions of price tied into these distinctions.

Last — but surely not least — the district court took appropriate steps to guard against any unfair prejudice.  For one thing, it gave considerable latitude to the defendant in cross-

examining Agent Tully about alternate meanings of various terms. For another thing, it was careful to instruct the jury to weigh the evidence independently.[8]  These safeguards were sufficient — in the circumstances at hand — to mitigate any risk of unfair prejudice.  See Henry, 848 F.3d at 12; Rosado-Pérez, 605 F.3d at 56.

Nothing more need be said about Agent Tully's testimony. We conclude that there was no plain error in the district court's challenged rulings concerning this testimony.  Accordingly, we reject the defendant's third claim of error.

**D**

This leaves the defendant's claim that the district court erred in permitting the government to introduce evidence of four intercepted calls between Suazo and the defendant.  In those calls, the two men discussed, among other things, potential drug transactions apart from the one that led directly to the defendant's arrest.

---

[8] Pertinently, the district court instructed the jury that it was free to "accept or reject [the expert's] testimony in whole or in part."  The court also instructed the jury that "[i]n weighing the testimony, [it] should consider the factors that generally bear upon the credibility of a witness as well as the expert witness's education and experience, the soundness of the reasons given for the opinion and all other evidence in the case." Finally, the court directed that the jury alone should "decide how much of the expert witness's testimony to believe, and how much weight it should be given."

The question is one of timing. The indictment charged a compressed conspiracy beginning on September 17, 2018 and ending on September 18 of the same year. The four challenged calls occurred on earlier dates (August 12, August 20, August 29, September 11). During pretrial proceedings, the defendant moved in limine to exclude evidence of these calls, contending that because they took place before the opening date of the charged conspiracy and some involved different drugs, they were "prior bad acts" evidence, likely to confuse the jury and cause unfair prejudice. See Fed. R. Evid. 404(b); see also Fed. R. Evid. 403.

The district court denied the defendant's motion, holding that the four challenged calls did not reflect "separate acts, but rather acts intrinsic to the charged conspiracy" and, thus, were admissible without regard to Rule 404(b). In the court's view, the conversations — which dealt with the "planning other similar narcotics transactions" — furnished "evidence of how the [d]efendant and his co-conspirator entered into an overarching conspiracy" and were admissible to "show the course of dealings between co-conspirators." The district court held, in the alternative, that even if the four calls were considered "prior bad acts" evidence within the ambit of Rule 404(b), they nonetheless could be admissible to "explain the background, formation, and development of the illegal relationship." (quoting United States v. Green, 698 F.3d 48, 55 (1st Cir. 2012)). The

- 29 -

court added that the probative value of the evidence was not substantially outweighed by any cognizable danger of unfair prejudice.

The defendant renewed this objection at trial, but the district court held firm. The evidence was admitted, and the defendant presses his claim of error on appeal. Our review is for abuse of discretion. See United States v. Simon, 12 F.4th 1, 40-42 (1st Cir. 2021) (Rule 403); United States v. Robles-Alvarez, 874 F.3d 46, 50 (1st Cir. 2017) (Rule 404(b)).

Under Rule 404(b), evidence of other acts is not admissible to prove a defendant's character or propensity, but such evidence may be admitted if it has "special relevance." Henry, 848 F.3d at 8. Evidence may have special relevance if it is offered to show, say, "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2). Even if specially relevant, though, such evidence is inadmissible if its probative value is substantially outweighed by its unfairly prejudicial effect. See Fed. R. Evid. 403. And when evidence is intrinsic to elements of a charged offense, Rule 404(b) is simply not implicated. See, e.g., Robles-Alvarez, 874 F.3d at 50; Villarman-Oviedo, 325 F.3d at 11.

Here, the district court, in effect, used a belt and suspenders. The court prudently made alternative holdings. It

held that the challenged calls were intrinsic to the conspiracy and that — even if they were not — they were admissible under Rule 404(b).  The defendant contests both rationales.

To begin, the defendant contends that the calls were not intrinsic to the charged conspiracy because they transpired several weeks before the conspiracy's opening date.  Moreover, certain of the calls focused on drugs and transactions other than the ones involved in the charged conspiracy.  This contention is not without some bite, and we think it arguable that some of the calls were not intrinsic to the charged conspiracy.  But we need not decide this question:  rather, we assume, albeit without deciding, that the four earlier calls were not intrinsic to the charged conspiracy and that, therefore, Rule 404(b) applies.

Even on this defendant-friendly assumption, it was not an abuse of discretion to admit the four recorded conversations into evidence.  In our judgment, the district court did not abuse its discretion in determining that all the calls had special relevance because they were harbingers of what was to come:  they were probative of the development of the charged conspiracy and of the nature of the working relationship between Suazo and the defendant.  See United States v. Green, 698 F.3d 48, 55 (1st Cir. 2012) (holding that "in a conspiracy case, 'evidence of other bad acts . . . can be admitted to explain the background, formation, and development of the illegal relationship, and, more

- 31 -

specifically, to help the jury understand the basis for the co-conspirators' relationship of mutual trust'" (alteration in original) (quoting United States v. Escobar-de Jesús, 187 F.3d 148, 169 (1st Cir. 1999))).

The defendant demurs, insisting that even if the calls had special relevance, their admission created an intolerable risk of unfair prejudice. Admitting them, he muses, likely lured the jury into convicting him based on general speculation that he was a drug dealer.

The district court rejected this plaint, and so do we. Particularly in light of the revelatory nature of the calls and the other compelling evidence of the defendant's guilt, the district court did not abuse its discretion in determining that the probative value of the calls was not substantially outweighed by any unfairly prejudicial effect. See Green, 698 F.3d at 56; Escobar-de Jesús, 187 F.3d at 169-70; see also Fed. R. Evid. 403. We have made it luminously clear that "[o]nly rarely — and in extraordinarily compelling circumstances — will we, from the vista of a cold appellate record, reverse a district court's on-the-spot judgment concerning the relative weighing of probative value and unfair effect." United States v. Mehanna, 735 F.3d 32, 59 (1st Cir. 2013) (quoting Freeman v. Package Mach. Co., 865 F.2d 1331, 1340 (1st Cir. 1988)). This is a far cry from that rare case.

**III**

We need go no further.  For the reasons elucidated above, the judgment of the district court is

**<u>Affirmed</u>**.