**UNITED STATES of America, Appellee,**

v.

**Joseph Anthony LAMATTINA, a/k/a Joe Black, Defendant, Appellant.**

No. 88–1208.

United States Court of Appeals, First Circuit.

Heard May 3, 1989.

Decided Nov. 21, 1989.

**1192**

Richard M. Egbert, Boston, Mass., for defendant, appellant.

Frank J. Marine, Dept. of Justice, Washington, D.C., with whom Jeremiah T. O'Sullivan, U.S. Atty., Boston, Mass., and Gregg L. Sullivan, Sp. Atty., Dept. of Justice, were on brief for the U.S.

Before CAMPBELL, Chief Judge, TORRUELLA and SELYA, Circuit Judges.

TORRUELLA, Circuit Judge.

After a jury trial, defendant Joseph Anthony Lamattina ("Lamattina") was found guilty of unlawfully making an extortionate extension of credit (18 U.S.C. § 892(a)) (one count) and attempting to collect an extension of credit by extortionate means (18 U.S.C. § 894) (two counts). On appeal, Lamattina challenges the verdict based on insufficiency of the evidence and assigns three errors related to the admissibility of evidence. We affirm the district court on all assignments of error.

BACKGROUND

The facts which the jury could have found are as follows. In 1982, William DiStefano ("DiStefano") was the owner of an unprofitable used car business, as well as a clothing store. When he experienced difficulty in repaying several commercial loans, he placed a mortgage on his girlfriend's house. But even that soon proved to be insufficient and he then turned to less conventional channels. DiStefano contacted Anthony Stancatto ("Stancatto") in 1982, and asked him to arrange a meeting with appellant. DiStefano had known appellant since 1970 and was aware of his reputation as a "loan shark." When they met, DiStefano asked appellant for a $5,000 loan. Appellant took the request under advisement. At a second meeting, appellant granted DiStefano the loan, at an interest rate of 5% per week. No documents were ever signed. DiStefano testified that at the time the loan was made, he understood he would get hurt if he failed to repay the loan. Thereafter, DiStefano made weekly interest payments of $250.00.

In February 1983, DiStefano borrowed another $5,000 from appellant, this time at 3% interest per week. Once again, he did not sign any documents. In addition to the interest payment, DiStefano also lent appellant a car, which, they agreed, appellant could use until DiStefano repaid the second loan. Appellant, however, returned the car soon after he discovered that it had been stolen. DiStefano then sold the car and used the proceeds to repay the second loan.

Barely a month later, DiStefano again borrowed $5,000 from appellant at 3% interest per week. He testified that it was his understanding, at that time, that if he failed to pay off the loan, appellant would hurt him.

By December 1983, DiStefano had fallen behind in the interest payments on the two outstanding loans. He began "hiding" from appellant, other "loan sharks," and state authorities who were investigating him regarding his used car business. At about the same time, appellant went to DiStefano's store and told DiStefano's girlfriend: "tell him he took my blood, I'll take his."

Soon thereafter, DiStefano surrendered to the state authorities. After meeting with FBI agents, he agreed to cooperate with them. On February 6, 1984, DiStefano had a tape recorded conversation with appellant, in which appellant told DiStefano that he had to repay the loan. DiStefano asked appellant whether there was any way that he could "start taking it off the top." This refers to a practice whereby the debtor starts making principal payments. Although it is less favorable to the creditor, it enables the creditor to get back all his money when he thinks the principal is in danger. Appellant directed DiStefano to contact Stancatto the following day in order to make arrangements in this regard. He warned DiStefano that he

had "no place ... to hide." After a meeting with Stancatto on February 7, and another with appellant, DiStefano agreed to pay $200 a week until a total of $15,000 was paid.

## SUFFICIENCY OF THE EVIDENCE

Appellant avers that the government's proof was insufficient to establish the elements of the crime beyond a reasonable doubt. In considering the sufficiency of the evidence in a criminal case, the proper standard is whether, "viewing the evidence in the light most favorable to the government and without assessing the credibility of the witnesses," a reasonable person could have found the defendant guilty beyond a reasonable doubt. *United States v. Machor*, 879 F.2d 945, 948 (1st Cir.1989).

Under 18 U.S.C. § 892(a), it is a crime to make any extortionate extension of credit. An extortionate extension of credit is any:

> extension of credit with respect to which it is the *understanding of the creditor and the debtor at the time it is made* that delay in making repayment or failure to make repayment could result in the use of violence or other criminal means to cause harm to the person, reputation, or property of any person.

18 U.S.C. § 891(6) (emphasis supplied). The term "understanding" as used in this section, is not limited to a mutual agreement. The term includes cases where it is recognized by the parties that illegal means or violence will be used to collect the debt. *United States v. DeVincent*, 546 F.2d 452, 455 n. 1 (1st Cir.1976), *cert. denied*, 431 U.S. 903, 97 S.Ct. 1694, 52 L.Ed.2d 387 (1977). Appellant's contention is that there was no evidence from which a reasonable jury could infer that the understanding between the parties was that if DiStefano delayed or failed in his payments, DiStefano would suffer harm by violent or illegal means.

▮ After reviewing the evidence in the light most favorable to the prosecution, we find that it was more than sufficient to infer the requisite "understanding." DiStefano repeatedly testified that at the

time he got the loans he thought that he would get hurt if he did not repay them. He also specifically stated that he was afraid of appellant when he had fallen behind in the interest payments. Additionally, appellant appears to have threatened DiStefano on two separate occasions. First, he went to DiStefano's store and communicated a threat to DiStefano's girlfriend. Second, he directed DiStefano to meet with Stancatto and warned he had "no place ... to hide." Although these threats were made after the time of the loans, they may still shed light on appellant's intentions when he made the loans. Surely, this evidence is more than sufficient to reasonably infer the requisite "understanding." [1]

## EXPERT TESTIMONY

At trial, the government presented the testimony of FBI Agent Arthur Eberhart. Given Eberhart's experience, training and background in loansharking cases, the district court qualified him as an expert witness. He testified regarding the meaning of terms used in the government's recorded conversations. For instance, he explained that in loansharking transactions "juice" refers to the interest. Eberhart also explained the *modus operandi* of loanshark operations. Finally, Eberhart testified that, after reviewing the transcript of the recorded conversations and based on his training and experience, he was of the opinion that the conversation involved a loansharking transaction.

Appellant mounts a dual attack on the admissibility of Eberhart's testimony. He finds Eberhart's testimony inadmissible because it constitutes an opinion as to defendant's state of mind, Fed.R.Evid. 704(b), and because it is unhelpful or unnecessary, Fed.R.Evid. 702.

▮ Appellant does not dispute that as a general rule an expert witness may state an opinion on an ultimate fact. Clearly, Fed.R.Evid. 704 effectively abolished the blanket prohibition on opinions about an

---

1. We find appellant's other asseverations on this point to be totally without merit. They are not directed to the sufficiency of the evidence but to its evaluation.

ultimate issue. Instead, he relies on the 1984 amendment to the rule, which excludes opinions about defendant's mental state or condition constituting an element of the offense charged. Fed.R.Evid. 704(b). In this case, however, Eberhart did not testify as an expert on defendant's state of mind. He explained only what certain loansharking terms meant and opined that the recorded conversations involved loansharking. At the most, this testimony may have provided the jury with some basis for an inference as to defendant's state of mind. This is not enough. *United States v. Angiulo*, 847 F.2d 956, 975 (1st Cir.1988).

Appellant also argues that the expert's opinion was inadmissible under Fed.R.Evid. 702. This rule provides as follows:

> If scientific, technical, or ohter specialized knowledge *will assist the trier of fact to understand the evidence or to determine a fact in issue*, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise. (Emphasis supplied).

■ Under Fed.R.Evid. 702 the proper inquiry is "whether the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject matter involved...." *United States v. Rivera–Rodriguez*, 808 F.2d 886, 888 (1st Cir.1986) (quoting from Fed.R. Evid. 702, Advisory Committee Notes). In determining whether to admit expert testimony, the trial court has wide discretion. *Hamling v. United States*, 418 U.S. 87, 108, 94 S.Ct. 2887, 2903, 41 L.Ed.2d 590 (1974). We find that the district court did not abuse its discretion in admitting the Eberhart testimony. Expert testimony, such as that of Eberhart, is helpful in cases where juries must determine the meaning and significance in recorded conversations of the jargon used in criminal operations. Without Eberhart's specialized knowledge, the jury would probably have been at a loss to understand the significance of part of the evidence. *See United States v. Angiulo*, 847 F.2d at 975. No error was committed.

### THE FEBRUARY 7 TAPE RECORDED CONVERSATION

■ Appellant challenges the admissibility of the February 7 tape recorded conversation between DiStefano and Stancatto. According to appellant, the district court should have suppressed redacted portions of this conversation because they are "not relevant on the matter on trial and highly inflammatory and prejudicial." Part of this conversation referred to DiStefano's transactions with one Peter Limone. We find appellant's argument totally unconvincing. It was appellant who directed DiStefano to meet with Stancatto to arrange loan repayment. The thrust of the conversation between DiStefano and Stancatto concerned this arrangement. This part of the conversation is highly relevant to establish the charged offense. As to DiStefano's transactions with Limone, we do not find that reference to be prejudicial to appellant. If anything, the conversation about DiStefano's transactions with Limone supports appellant's theory that the "loansharks" were Limone and others.

### EVIDENCE ABOUT FIREARMS

■ Lastly, appellant argues that the district court erred in allowing DiStefano to testify that he turned over three pistols to an FBI agent. Because appellant failed to object during DiStefano's testimony, he did not preserve this argument for appeal. We, therefore, will not consider it now for the first time.

*Affirmed.*