# United States Court of Appeals
## For the First Circuit

No. 20-1311

UNITED STATES OF AMERICA,

Appellee,

v.

RAFAEL SOLER-MONTALVO,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Gustavo A. Gelpí, U.S. District Judge]

Before

Thompson and Howard, Circuit Judges,
and Woodcock,* District Judge.

Andrew S. McCutcheon, Assistant Federal Public Defender, with whom Eric Alexander Vos, Federal Public Defender, Franco L. Pérez-Redondo, Assistant Federal Public Defender, Supervisor, Appeals Division, and Kevin E. Lerman, Research & Writing Specialist, were on brief, for appellant.
Ross B. Goldman, with whom W. Stephen Muldrow, United States Attorney, Mariana Bauza and Ginette L. Milanés, Assistant United States Attorneys, Nicholas L. McQuaid, Acting Assistant Attorney General, and Robert A. Zink, Acting Deputy Assistant Attorney General, were on brief, for appellee.

---

* Of the District of Maine, sitting by designation.

August 2, 2022

**THOMPSON**, **Circuit Judge**. After a four-day trial, a federal jury in Puerto Rico found Rafael Soler-Montalvo guilty of attempting to persuade, induce, or entice a minor to engage in criminal sexual activity. Appealing, he flags three areas of error. He says the evidence was constitutionally insufficient to convict him, that the district court erred in limiting the testimony of his expert witness, and that the prosecution engaged in a string of misconduct that ultimately discolored the jury's view of the trial. Finding the evidence sufficient, but the trial tainted by the erroneous limitation of Soler's expert's testimony, we vacate and remand for a new trial.

## BACKGROUND

The story begins in March 2017. Soler was a 64-year-old retiree from the NYPD living in Guánica, Puerto Rico. After separating from his spouse at some point prior to 2017, he became lonely and had trouble socializing. So he began using some dating websites. One of the websites he used for dating was Craigslist, specifically the "Casual Encounters" section, where people posted personal ads.

In late March or early April 2017, one of the ads up on Craigslist in Puerto Rico was titled: "In Mayagüez for a few weeks." Opening up the ad that was posted as a "69" year-old woman (the poster) seeking a man (the responder), it said: "Hey, I'm visiting Mayagüez for a little bit, looking for a cool guy to spend

- 3 -

some time with."  One of the people who responded to the posting was Soler.  After that, someone responded to Soler's email saying: "Hey, what's up can you send me a message on Kik Messenger at JanisN666.  If you're into young thin girls say hi."  "Janis," though, was actually Special Agent Ryan Sieg from Homeland Security Investigations, posing as a young girl.

From there, a Kik user -- later identified as Soler -- going by the username "4Real4U2Day" sent a message to Janis.  And a conversation sparked over the next days or weeks.  We'll get into much more detail later on, so we'll just give the highlights now.

Soler introduced himself (including telling Janis his background, where he lived, and about his children), asked Janis questions about her experience in Puerto Rico, and asked about where she was from.  Quite early on in the conversation, Janis told Soler that she was 13 years old.  Although Soler chuckled that remark off and said he thought Janis was joking, Janis doubled down that she was only 13.  And although Soler expressed surprise that a 13 year old was posting on Craigslist Casual Encounters (which requires the poster to verify they are over 18), he acknowledged there was no way for Craigslist to verify that information.

From there, the conversation turned sexually explicit. Soler began asking Janis for photos of herself and making

suggestive comments about her appearance. Eventually, Janis shared two photographs of "herself," which were actually childhood photos of a female law-enforcement officer used with her consent. The photos, which clearly reflected an underage girl, generated more suggestive comments from Soler about Janis's physical appearance. And the conversation became very sexual, with Soler telling Janis extensively -- and in some detail -- about the sexual things he wanted to do to her. He even sent a sexually explicit photo of himself.

Soler also discussed meeting up with Janis. The two discussed logistics, including for how long Janis could get away from her family, whether family members would be suspicious, where they should meet, and how Janis would get there. Throughout their conversation, Soler revealed concern that they would be caught and repeatedly sought assurances from Janis that their meeting would be their secret and that she wouldn't tattle to her family or the authorities. The two ultimately agreed to meet at the Walmart at the mall in Mayagüez. But on the day of the meet, "Janis" got scared and refused to come outside -- though not before figuring out what kind of car Soler was driving. After trying to convince Janis to come outside, Soler eventually drove away, leaving Janis with a reminder that everything should remain their secret. Soler was soon pulled over and arrested, and the officers pulled Soler's

cell phone -- with the messages with Janis still on it -- out of the truck.

Following his arrest, a Puerto Rico federal grand jury handed down an indictment charging Soler with one count of attempt to persuade, induce, or entice a minor to engage in criminal sexual activity, in violation of 18 U.S.C. § 2422(b).  And so began the criminal proceedings that eventually brought Soler to us.  We'll offer more detail on all the procedural history later as it becomes relevant to the analysis.  But, at a high level, here's what went down.  At the district court, Soler and the government jostled over a host of issues before, at, and after the trial.  Pre-trial, their spars included motion practice over the admission of Soler's proposed expert, with the district court ultimately issuing four separate, short orders on the subject, seemingly changing its mind (again, more on that later).  After going to trial, at which Soler testified, a jury convicted Soler of the sole count against him. Soler moved for both a judgment of acquittal (claiming insufficient evidence to convict) and a new trial (claiming a litany of trial errors, including alleged evidentiary misfires, jury-instruction errors, and prosecutorial misconduct).  The district court denied both motions, and Soler timely appealed.

**DISCUSSION**

## I.  Sufficiency of the Evidence

We begin with Soler's argument that there was insufficient evidence to find him guilty beyond a reasonable doubt, and that the district court therefore should have ordered an acquittal.  See Fed. R. Crim. P. 29.  Because Soler preserved his challenge to the sufficiency of the evidence below, our review is de novo.  See United States v. Maldonado-Peña, 4 F.4th 1, 50 (1st Cir. 2021), cert. denied sub nom. Rivera-George v. United States, 142 S. Ct. 1184 (2022).  So we look at the issues with fresh eyes and without any deference to the district court's assessment.  Id.

In testing the evidentiary sufficiency, we must "determine whether 'any reasonable jury could find all the elements of the crime [proven] beyond a reasonable doubt.'"  United States v. Seary-Colón, 997 F.3d 1, 11 (1st Cir. 2021) (quoting United States v. Santos-Soto, 799 F.3d 49, 57 (1st Cir. 2015)), cert. denied, 142 S. Ct. 184 (2021).  The question is not whether "no verdict other than a guilty verdict could sensibly be reached," but only whether "the guilty verdict finds support in a plausible rendition of the record."  Id. (quoting United States v. Hatch, 434 F.3d 1, 4 (1st Cir. 2006)).  To affirm, we need not be satisfied that "the government succeeded in eliminating every possible theory consistent with the defendant's innocence."  Id. at 14 (citation omitted).

To conduct our analysis, we review the record in the light most favorable to the verdict. United States v. Clough, 978 F.3d 810, 816 (1st Cir. 2020). In doing so, "we do not view each piece of evidence separately, re-weigh the evidence, or second-guess the jury's credibility calls." Seary-Colón, 997 F.3d at 12. Rather, we "giv[e] the prosecution the benefit of all sensible inferences and credibility choices." United States v. Cruz-Ramos, 987 F.3d 27, 36 (1st Cir. 2021). Indeed, it is not our role to "decide 'which witness to credit,'" for we must assume that the jury "credited those witnesses whose testimony lent support to the verdict." Id. at 38 (quoting United States v. Lara, 181 F.3d 183, 204 (1st Cir. 1999)).

In the end, "[w]e will only reverse on a sufficiency challenge if, 'after viewing the evidence and reasonable inferences in the light most flattering to the prosecution, [we conclude that] no rational jury could have found [the defendant] guilty beyond a reasonable doubt.'" Seary-Colón, 997 F.3d at 11 (quoting United States v. Acosta-Colón, 741 F.3d 179, 191 (1st Cir. 2013)). But if we do reverse, then that seals the deal because we must order acquittal, which then precludes a second trial. See Maldonado-Peña, 4 F.4th at 50.

Soler was charged with attempted coercion and enticement of a minor, in violation of 18 U.S.C. § 2422(b). To prevail, the government had to prove, beyond a reasonable doubt, that Soler (1)

used a facility of interstate commerce (2) to attempt to, or to knowingly, persuade, induce, or entice (3) someone younger than eighteen years old (4) to engage in criminal sexual activity. See United States v. Dávila-Nieves, 670 F.3d 1, 7 (1st Cir. 2012). To prove its attempt theory, the government had to show that Soler "inten[ded] to commit the substantive offense" and took "a substantial step towards its commission." United States v. Berk, 652 F.3d 132, 140 (1st Cir. 2011). As most pertinent here, the parties agree that the government had to prove -- again, beyond a reasonable doubt -- that Soler believed Janis was a minor.[1]

According to Soler, there was evidence that "undermined" the idea that he knew he was communicating with a minor. Chiefly, Soler points out that the encounter with Janis originated from a website designed specifically for adults, which required that the poster affirm she is over the age of 18. He contends that there were points in the conversation with Janis that showed that it was a role-play, including Janis's supposed understanding of what a "daddy relationship" entails. And he points to his "candid"

---

[1] We note the circuits have divided concerning whether a defendant must know the individual being persuaded, induced, or enticed was a minor. See United States v. Montijo-Maysonet, 974 F.3d 34, 43 (1st Cir. 2020) (describing the split and collecting cases). It does not appear that we have decided whether mistake of age is an available defense to a prosecution under § 2422(b). See id. But, in any event, the government itself conceded in the district court that it had to prove that Soler believed Janis was a minor. So we need not decide that question here.

testimony in which he "categorically rejected" that he thought he was doing anything but role-playing.

The problem with Soler's arguments, though, is that there was plenty of other circumstantial evidence from which a reasonable jury could have surmised that Soler believed he was speaking with a minor. For example, in his messages with Janis, Soler expressed surprise that someone so young posted on Craigslist after Janis said she was 13. But Janis responded: "Ya so? Anyone can[.]" And Soler agreed with her: "I realize that, they have no way of knowing." Plus, Janis out and out told Soler that she was 13 years old. And though Soler replied with a snicker that he was 100 years old and later said that he thought Janis was "joking" that she was 13, Soler continued the conversation after Janis repeated that she was only 13. And she brought it up again, asking Soler twice if he was "cool with [her] being 13," to which Soler one time responded: "Why shouldn't I be? You sound very mature [] and from your pic very nice also."

What's more, Janis sent two fake photographs of herself, and those photos were quite clearly of an underage girl. See United States v. Montijo-Maysonet, 974 F.3d 34, 44 (1st Cir. 2020) (noting the jury could find that photographs depicted a minor). Soler also reacted to the photographs, calling Janis "gorgeous" and her (clearly underage) body "beautiful," later telling her

- 10 -

that he was "admiring [her] sexyness [sic]," and even asking for more photos on multiple occasions.

Additionally, the conversation between Soler and Janis could also be viewed as reflecting Soler's belief that Janis was young and sexually inexperienced.  For example, Janis asked if sex was "going to hurt[.]"  Janis told Soler that she "d[oes]n[']t really know much about sex" and that she worried that she "won[']t be good at sex probably like older girls and [she] will feel bad[.]"  But Soler told her:  "I won't let you feel you bad, your [sic] so beautiful I will make you feel very good[.]"  Janis also expressed inexperience with condoms, oral sex, and lubricants, and asked if certain things were "what girls do . . . . [l]ike older girls?"  Soler acknowledged Janis's lack of experience, too, asking her if she had "ever hear[d] of doggy style" and telling her, "[y]ou[']ll probably be nervous but I'll try to keep you calm and happy[.]"

Soler also repeatedly expressed concern about getting caught.  He pressed again and again that everything should be kept his and Janis's "secret," seeking assurances that she wouldn't tattle.  In arranging their meeting, Soler persistently worried that Janis's cousin, who would have to drive Janis to the mall, would not think anything amiss if Janis disappeared for a couple of hours and cautioned Janis not to let anyone see her texting on the day of the meet-up.  He said it would be best if they could go

to his home instead of a motel because "it's a lot safer here at home. No nosey people around us." Later, he acknowledged it could be "too risky" for them to go to the beach or a movie. And he told Janis that once she got in the car she could "put the seat back . . . [so] nobody can spot [her]." Soler contends that all of this was part of the role-play. But given that the jurors knew he was a retired detective, and just given the jurors' common sense, see Montijo-Maysonet, 974 F.3d at 42 (noting "[j]urors don't have to check 'common sense' or 'mature experiences' at the courthouse door" (citation omitted)), they could have inferred that Soler was saying all of this because he knew the risks involved and needed to cover his tracks.[2]

Soler took even more steps that a jury could have seen as beyond a simple role-play. Soler discussed with Janis using a unique type of condom, which he said was only sold at a store called "Condom World." So he told her he would call the store near the mall where they were going to meet to see if they had any in stock. And, in fact, Soler actually called that store like he said he would. Soler also discussed a strawberry lubricant with Janis, and he in fact had that same strawberry lubricant in his

---

[2] Soler also testified that his risk concerns arose from his fear that the person who he was communicating with, and who he believed to be another adult, might release all of the personal information Soler had shared and embarrass him. Again, as with his role-play testimony, it was the jury's call on whether to believe that explanation or not.

home.  The jury reasonably could have drawn the inference that someone wouldn't have taken those steps had it been a mere role-play.[3]

To be sure, Soler testified that he never believed Janis was a minor, he was merely role-playing (though he never clearly defined the contours of what role-playing involved for him, whether it was merely cyber-based or possibly in-person).  And, in explaining why he assumed it was role-play, Soler testified about

---

[3] Soler's expert (who we'll get to in more detail later) told the jury about so-called "de-masking" activities that occur from role-playing online, in which one party tries to identify who the other party they're talking to really is.  So (Soler's argument goes) he went to the meet-up to try to de-mask his conversation partner, knowing full-well that a meet-up "most likely wasn't going to happen."  And, apparently trying to account for the real-life steps Soler took here, his counsel seemed to insinuate at closing argument that Soler might have left open the possibility that his meet-up could end in a consensual sexual encounter, perhaps continuing the role-play in-person, with that adult.  Problem is, Soler didn't testify that he was preparing for such a real-life sexual encounter.  Instead, Soler testified that he tried to meet up merely because he "was extremely curious to whom [he] was speaking."  And he never testified that he intended to continue his role-play fantasy in-person with another adult, instead testifying only that "going to meet up and have sex" was one of his undefined "fantasies" in the chat.  Nor was Soler asked at trial why he took these real-life steps.  Moreover, Soler's expert Dr. Kraft did not testify about de-masking habits leading to consensual, in-person, role-playing sexual encounters.  Dr. Kraft testified only that de-masking, which "doesn't happen that often," usually leads to the two individuals "laugh[ing]" about the fantasy, or is borne out of one party's "frustration" with people misrepresenting themselves.  Given Soler's and Dr. Kraft's testimonies, the jury could have reasonably rejected Soler's closing-argument insinuation that he was preparing for a consensual adult sexual encounter with the steps he actually took outside of the role-play chat.

holes he saw in Janis's story that he said led him to believe she was not actually the 13-year-old girl she claimed to be.  Soler noted that it made no sense that a girl that young would have been on a three-to-four-week April school vacation, and that it was odd that she was unfamiliar with the geography of Virginia even though that's where she said she lived.

Ultimately though, it was up to the jury to decide whether to credit Soler's testimony in the face of this ample evidence questioning Soler's claimed belief that he was only role-playing with a consenting adult.  "[S]ifting through conflicting testimony and determining where the truth lies is the sort of work that falls squarely within the jury's province, not ours."  Cruz-Ramos, 987 F.3d at 38 (cleaned up) (quoting United States v. Nascimento, 491 F.3d 25, 46 (1st Cir. 2007)).  And the jury "was, of course, free to reject [Soler's] defense" that "he had no interest in actually having sex with [a] minor[], but was instead engaging in a form of 'role playing.'"  Berk, 652 F.3d at 140 n.8; see also United States v. Gomez-Villamizar, 981 F.2d 621, 624 (1st Cir. 1992) (noting the jury is not obligated to credit a defendant's testimony that she didn't know there was cocaine in the suitcase); United States v. Ocampo-Guarin, 968 F.2d 1406, 1410 (1st Cir. 1992).

Nor was the evidence, as Soler contends, in equipoise concerning his guilt and innocence.  It is true that we "must

reverse a conviction on the grounds of evidentiary insufficiency where an equal or nearly equal theory of guilt and a theory of innocence is supported by the evidence viewed in the light most favorable to the verdict." United States v. Rodríguez-Martinez, 778 F.3d 367, 373 (1st Cir. 2015) (quoting United States v. Woodward, 149 F.3d 46, 57 (1st Cir. 1998)). But "this equal-evidence rule takes hold only after [we] ha[ve] drawn all reasonable inferences in favor of the verdict." United States v. Simon, 12 F.4th 1, 32 (1st Cir. 2021) (emphasis in original) (quoting Magraw v. Roden, 743 F.3d 1, 5 (1st Cir. 2014)), cert. denied, 142 S. Ct. 2811, 142 S. Ct. 2812 (2022); see also Rodríguez-Martinez, 778 F.3d at 373 (explaining the equipoise rule comes into play where "[w]ithout additional circumstantial evidence from which the jury could rationally infer that one was more supportable than the other, . . . [the] evidence . . . permits two equally plausible inferences"). Here, to find equipoise, we would have to credit Soler's testimony inconsistent with the verdict. That we cannot do, especially given the plentiful evidence from which the jury could reasonably infer that Soler's explanation was not credible.

The district court did not err in denying Soler's motion for a judgment of acquittal.

## II.  Exclusion of Dr. Kraft's Testimony

Soler contends the district court erroneously excluded part of the testimony of his proposed expert, Dr. Chris Kraft.  He accordingly demands a new trial.

Dr. Kraft, who holds a Ph.D. in clinical psychology, is a Board-certified psychologist working at the Johns Hopkins University specializing in internet sexual behaviors.  Before trial, Soler proffered Dr. Kraft to opine on two subjects.  First, Dr. Kraft would (and ultimately did) testify on the psychology behind internet communication and messaging, and specifically the frequency of role-play, imagination, or exaggeration in online messaging.  Second (and this one is important for us here), Soler wanted him to testify about "the difference between a desire to actually engage in sexual activity with a minor and mere fantasy and role-playing related to sexual contact with children."  As part of that category of testimony, Soler proffered that Dr. Kraft would testify that "the chats here . . . may be consistent with the conduct and behavior of consenting adults using forums for fun, play, fantasy and cybersex," but they are not consistent with the patterns of child sexual predators.

### A.  Preservation

On appeal, Soler complains that the district court, siding with the government's pre-trial motion, precluded Dr. Kraft from testifying on the second subject, the modus operandi of

- 16 -

predators and how his behavior differed. But the government throws in a new appellate wrinkle: It now says that Dr. Kraft's testimony was not at all limited by the district court as Soler claims, and since no such limitation was imposed upon him, the government declines on appeal to speculatively respond as to why Soler chose not to probe the issue at trial.

To evaluate the government's claim, a brief (but detailed) procedural recap is in order so the reader can follow our analysis that is to come. Initially, the district court granted the government's request to exclude Dr. Kraft's testimony in its entirety. In a six-sentence order, the court explained that Dr. Kraft's testimony "ultimately . . . involves the defendant's state of mind." As the court understood the proffer, "Dr. Kraft . . . would review the evidence and conclude that the same is probative of a desire to engage in fantasy role playing with children rather than in actual sexual contact," further opining that Soler "is not a typical internet sexual predator . . . [and] possesses none of the characteristics of one." Thus, the district court said, the testimony was not proper.

Unhappy, Soler moved for reconsideration of that ruling. In his motion, Soler explained that the district court did not recognize the two distinct areas of Dr. Kraft's proposed testimony: (1) testimony concerning "psychology of the internet, internet messaging, fantasy[,] and role-play"; and (2) testimony about the

patterns of sexual predators and analysis that Soler's actions here do not line up with those patterns.

Denying the motion for reconsideration, the court stated: "The Court notes that in the Joseph case from the Second Circuit, defendant himself testified and that the excluded evidence would have been relevant to defendant's credibility. Here, the proffered evidence seeks to be presented in a vacu[u]m and not in addition to any other evidence." But less than two hours later the district court walked things back. It amended its reconsideration order to add that "[s]hould [Soler] testify at trial, following said testimony the Court will allow the testimony of Dr. Kraft. See US v Joseph, 542 F3d 13, 21 (2nd Cir. 2008)."

Finally, when the time came for Dr. Kraft to testify at trial, the district court added another note: "[Y]ou have to remember the expert is just going to testify in general terms. He's not going to testify -- he hasn't interviewed him [meaning Soler], he hasn't -- he's not going to come to a conclusion about him. He can't talk about him."

Staring at these four terse, quite ambiguous orders, we're left to piece together whether the district court's rulings meant that Dr. Kraft could not testify about the patterns of sexual predators (i.e., the typical-predator testimony) and/or how Soler's actions did not fit those patterns (i.e., the not-a-typical-predator testimony). Reviewing the record, we think Soler

was correct to understand the court's orders as precluding Dr. Kraft from offering his not-a-typical-predator testimony.[4]

First, we think the district court's mid-trial qualification made clear that it was, in fact, limiting Dr. Kraft's ability to testify concerning Soler's actions in this case.[5] Contrary to the government's appellate position, Soler did not have free rein from the district court.[6] And the government does

---

[4] At oral argument, Soler was not clear whether he believed he was also precluded from introducing Dr. Kraft's opinion on the general pattern of sexual predators, separate from his analysis of how that pattern lined up with the facts here. His appellate briefing seems to make clear that he treated the typical-predator testimony and not-a-typical-predator testimony as one cohesive unit, such that he would not introduce one segment without the other. And his post-trial briefing did not suggest that he thought the typical-predator portion of the testimony was precluded -- only the not-a-typical-predator portion. We thus do not understand Soler to argue that he was precluded from introducing the limited segment of the testimony concerning the general pattern of sexual predators. Yet it was completely reasonable for Soler to treat Dr. Kraft's testimony as one integrated unit composed of both the typical-predator profile and the not-a-typical-predator analysis. The two were inextricably intertwined, and offering only the profile of an online predator, without the ability to demonstrate why he didn't fit that profile, would have been extremely prejudicial to Soler.

[5] The government, in its brief, fails to recognize that the district court ordered mid-trial that Dr. Kraft "can't talk about [Soler]." Instead, it claims that the district court's "final word" on the scope of Dr. Kraft's testimony was the amended order on the reconsideration motion, even though Soler's post-trial briefing pointed specifically to -- and quoted directly from -- the court's mid-trial order on the subject.

[6] The district court's citation to Joseph also further suggests that it "w[ould] allow the testimony of Dr. Kraft" only on the first category of evidence: the psychology of internet fantasy and role-playing. Indeed, Joseph involved only expert evidence of that category. See 542 F.3d at 21-22. It did not

- 19 -

not explain how Soler could have, consistent with that mid-trial order, elicited testimony about how his actions did not fit a predator's m.o. if Dr. Kraft had to "testify in general terms" and "[could]n't talk about [Soler]." Testifying about Soler's actions would, of course, have violated that limitation.

Second, the only apparent confusion about whether the not-a-typical-predator testimony was excluded has come from the government's appellate counsel. Indeed, the government's trial counsel below agreed in its briefing on Soler's new-trial motion that the district court had excluded Dr. Kraft's testimony concerning whether Soler's actions fit the pattern of an internet predator. As the government put it below: "[T]he Court properly determined that the proposed testimony was irrelevant and, even if relevant, it should be excluded." That was so, said the government, because "Dr. Kraft never evaluated, examined, or treated Soler so he could not . . . try to draw a comparison [from Soler] to other types of sexual predators he may have treated or studied."

---

involve proposed expert testimony concerning the patterns of sexual predators or whether the defendant in that case's actions fit the bill of a typical predator. See id. If the district court's re-reconsideration order was meant to swing open the door to expert testimony concerning how Soler's actions lined up with those typically expected of a predator, then Joseph would be an odd citation.

To tie a bow on it, the district court, post-trial, agreed with everyone's understanding of its orders. In denying Soler's motion for a new trial, the district court explained: "[T]he exclusion of part of Dr. Kraft's expert testimony was warranted. It is undisputed that he did not evaluate, interview, meet[,] nor treat [Soler]. . . . Thus, Dr. Kraft could not testify as to [Soler]'s state of mind." In fact, prior to ruling on the new-trial motion, the district court ordered Soler to identify where in the record each of his new-trial arguments was preserved by timely objection. Responding, Soler pointed to both the pre-trial orders and the court's mid-trial can't-talk-about-him order, after which the district court did not correct anyone's understanding of those orders.[7]

---

[7] At oral argument, the government argued that the district court's in-trial statement was merely a "rehash" of the agreement Soler made that he would not ask Dr. Kraft to testify directly about his state of mind. But Soler thrice explained that he would not ask Dr. Kraft to testify so directly, rather he would ask Dr. Kraft to testify only as to a comparison of the activities here to the modus operandi of sexual predators. Yet the district court's post-trial ruling apparently concluded that the proffered testimony, even considering that self-imposed limitation, would still have violated Rule 704(b), and the court thus concluded it did not err in imposing the limitation about which Soler complained. That makes the government's reading highly implausible. To buy it, we would have to assume that the district court either ignored or repeatedly misunderstood Soler's explanation -- and also the government's similar understanding -- that the issue presented was whether Dr. Kraft could testify as to whether Soler's actions fit the pattern of a typical predator without testifying directly about Soler's state of mind.

Given the parties' -- and the district court's -- clear understanding below of what was and wasn't excluded, we conclude, contrary to the government's contention here, that Soler is correct:  The district court precluded Dr. Kraft's proposed not-a-typical-predator testimony.  And so the evidentiary ruling is properly before us.

### B.    Merits

We turn now to examining if the district court was correct in barring Dr. Kraft from testifying about whether Soler's actions fit the mold of a sexual predator.  In excluding the evidence, the district court appeared to base its decision on two rules of evidence:  Rule 704(b) and Rule 403.  We take each in turn.

As we do so, we bear in mind that evidentiary calls are generally left to the district court's discretion.  See Maldonado-Peña, 4 F.4th at 37; United States v. Galíndez, 999 F.3d 60, 64 (1st Cir. 2021).  Still, abuse-of-discretion review is not toothless.  Jodoin v. Toyota Motor Corp., 284 F.3d 272, 279 (1st Cir. 2002).  A district court abuses its discretion "when a relevant factor deserving of significant weight is overlooked, or when an improper factor is accorded significant weight, or when the court considers the appropriate mix of factors, but commits a palpable error of judgment in calibrating the decisional scales."

United States v. Taylor, 848 F.3d 476, 484 (1st Cir. 2017) (quoting United States v. Jiménez, 419 F.3d 34, 43 (1st Cir. 2005)).

### 1. Rule 704(b)

Admission of expert testimony is governed by Federal Rule of Evidence 702. See Montijo-Maysonet, 974 F.3d at 47. But that's not the only hurdle expert testimony must clear. Expert testimony is still subject to the rigors of other rules, including in criminal cases Rule 704(b). That rule provides that "an expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense," since "[t]hose matters are for the trier of fact alone." Fed. R. Evid. 704(b); see United States v. Valle, 72 F.3d 210, 215 (1st Cir. 1995) (recounting the history of Rule 704(b)).

Applying Rule 704(b), we have held time and again that although "Rule 704(b) bars a witness from characterizing the defendant's intent, . . . it 'does not . . . apply to predicate facts from which a jury might infer such intent.'" United States v. Henry, 848 F.3d 1, 11 (1st Cir. 2017) (quoting United States v. Peña-Santo, 809 F.3d 686, 694 (1st Cir. 2015)); see Valle, 72 F.3d at 216; United States v. Lamattina, 889 F.2d 1191, 1193-94 (1st Cir. 1989).

Identifying where the line lies in the sand, we have held that "a qualified expert does not violate Rule 704(b) by

expressing an opinion as to whether predicate facts are consistent with drug distribution rather than mere possession." Henry, 848 F.3d at 11. Accordingly, expert testimony that "explained that the quantity of crack found at the search site was consistent with distribution, as opposed to personal use" in a case concerning intent to distribute drugs did not violate Rule 704(b). Valle, 72 F.3d at 216. Nor did an expert's opinion that the drugs at issue in a similar case were "packaged for sale" since "the expert grounded his opinion that the drugs were packaged for sale on his general knowledge of criminal practices and the circumstantial evidence bearing on the issue of intent that was produced during the trial." Henry, 848 F.3d at 11. Similarly, an expert's testimony that "recorded conversations involved loansharking" did not cross the line into testimony on the defendant's state of mind, but rather only "may have provided the jury with some basis for an inference as to defendant's state of mind." Lamattina, 889 F.2d at 1194 (emphasis added). In sum, we have held repeatedly that testimony that a defendant's actions are consistent with the modus operandi of illegal activity, though allowing the jury to infer the defendant's state of mind, does not violate Rule 704(b)'s ultimate-issue prohibition.

Dr. Kraft's not-a-typical-predator testimony fits comfortably within that rubric. Dr. Kraft would have compared the conversations and surrounding circumstances of this case to the

patterns of online predators and identified inconsistencies, thus suggesting that Soler's actions did not accord with those of a typical predator. We see no distinction between that testimony and a government-offered expert's testimony that the manner in which drugs were packaged were consistent with the m.o. of drug distributors where the issue was whether the defendant intended to distribute drugs. See Henry, 848 F.3d at 11; Valle, 72 F.3d at 216. Nor is there any daylight between the testimony here and the testimony in Lamattina concerning whether the recorded conversations "involved loansharking" in a prosecution for loansharking. 889 F.2d at 1194. The only difference is that the testimony here was that Soler's actions were not consistent with illegal activity.

In this precise scenario, one of our sister circuits has drawn the same conclusion, just on the side of the government. In United States v. Romero, 189 F.3d 576 (7th Cir. 1999), the Seventh Circuit faced a defendant's challenge to a government-proffered expert who testified that "hypothetical" facts mirroring the defendant's actions were consistent with the patterns of child molesters, id. at 585-86. The defendant there was charged with various counts related to his transportation of a minor with the intent to engage in criminal sexual activity. Id. at 581. Objecting that the expert's analysis of the supposed hypotheticals violated Rule 704(b), the defendant argued that the testimony was

- 25 -

tantamount to an opinion on his intent to molest the victim.  Id. at 586.  The Seventh Circuit rejected that argument.  Id.  Relying on case law in that circuit similar to ours in Henry and Valle concerning drug distribution, the court said that the testimony passed Rule 704(b) comfortably since the expert "never directly opined as to [the defendant's] mental state."  Id.  Nor did his explanation of "what types of actions might distinguish the actual molester from the mere collector of child pornography" violate Rule 704(b), even where the defendant admitted an interest in child pornography but disclaimed any intent to act on that interest. Id.; see id. at 582.

So too here.  Dr. Kraft's not-a-typical-predator testimony, as proffered by Soler, did not cross the line into the territory of Rule 704(b).  Rather, his testimony was limited only to whether certain facts were consistent with the pattern typically seen with individuals who were interested in having sex with minors.  Just as an expert may opine on whether the packaging of drugs is consistent with distribution, Dr. Kraft could have permissibly testified about whether Soler's actions here were consistent with role-play rather than the pattern of those who entice minors into sexual activity.  The district court abused its discretion in precluding this testimony under Rule 704(b).

## 2.  **Rule 403**

The district court also appeared to conclude that Dr. Kraft's not-a-typical-predator testimony should be excluded under Rule 403, noting (without citing the rule) that "any probative value of the [testimony] is substantially outweighed by confusion of the issue at bar, to wit, [Soler]'s state of mind."[8]  Rule 403 allows a court to "exclude relevant evidence if its probative value is substantially outweighed by," among other reasons, "a danger of . . . unfair prejudice, confusing the issues, [or] misleading the jury . . . ."  Fed. R. Evid. 403.

Even though Dr. Kraft's testimony passed the strictures of Rule 702's gatekeeping of expert evidence, it was still subject to the Rule 403 balancing test.  See United States v. Pires, 642 F.3d 1, 12 (1st Cir. 2011).  As we have explained before, there is a particular worry with expert testimony that "jurors may assign more weight to [it] than it deserves."  Id.  Expert testimony "can

---

[8] The district court's reliance on Rule 403 is further muddled by its subsequent orders on the issue.  In denying Soler's motion for reconsideration, it did cite Rule 403, but not for the same reason it suggested in its initial order.  Rather, the reconsideration order spotted a risk of prejudice or confusion in the fact that the evidence would be presented in a vacuum and not to support the credibility of Soler's testimony, since Soler to that point had not said that he planned to testify in his own defense.  Of course, Soler ultimately testified.  And later on when denying Soler's motion for a new trial, the district court did not again recite its "substantially outweighed" language, but merely said that Dr. Kraft's testimony would have offered an opinion on Soler's state of mind, thus signaling reliance on Rule 704(b) -- not Rule 403.

carry with it an unwarranted 'aura of special reliability and trustworthiness,'" id. (quoting United States v. Fosher, 590 F.2d 381, 383 (1st Cir. 1979)), so "courts must guard against letting it intrude in areas that jurors, by dint of common experience, are uniquely competent to judge without the aid of experts," id. "Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 . . . exercises more control over experts than over lay witnesses." Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 595 (1993) (quoting Jack B. Weinstein, Rule 702 of the Federal Rules of Evidence Is Sound; It Should Not Be Amended, 138 F.R.D. 631, 632 (1991)).

We review district courts' Rule 403 rulings under the abuse-of-discretion framework detailed above, with a few additional notes. We have said specifically to Rule 403 that district courts have "wide discretion in steadying the . . . seesaw." Pires, 642 F.3d at 12. Reflecting our deference for the district court's battlefield judgment, it is only in the rarest and most compelling cases that "'we, from the vista of a cold appellate record,' [will] reject a judge's on-the-scene Rule 403 ruling." United States v. Rodríguez-Soler, 773 F.3d 289, 294 (1st Cir. 2014) (quoting DiRico v. City of Quincy, 404 F.3d 464, 468 (1st Cir. 2005)).

Still, the standard for exclusion under Rule 403 is a high one. See United States v. Fahey, 769 F.2d 829, 841 (1st Cir.

1985).  When conducting the Rule 403 balancing test, courts must heed that the default rule is that relevant evidence will be admitted.  See United States v. Jones, 689 F.3d 12, 19 (1st Cir. 2012).  And it is not enough for Rule 403 that the evidence's dangers of unfair prejudice or confusion somewhat outweigh the probative value of the evidence.  See United States v. Trenkler, 61 F.3d 45, 56 (1st Cir. 1995) (concluding prior-bad-acts evidence was admissible under Rule 403 even though there was "some danger" that the jury would use it to assume a defendant's propensity for criminal behavior).  Rule 403 permits exclusion not when the evidence is merely outweighed by the dangers of its admission, but only when it is "substantially outweighed."  See Fed. R. Evid. 403 (emphasis added).

With that framework in mind, and mindful of our bounded review, we think the district court -- to the extent it relied on Rule 403 in excluding Dr. Kraft's testimony -- erred in determining both the probative value of the evidence and, relatedly, that the probative value was substantially outweighed by a risk of confusing or misleading the jury.

Probative value.  Dr. Kraft's not-a-typical-predator testimony was highly relevant to and probative of the key issue in the case.  Soler's defense effectively revolved around his argument that he was merely role-playing and did not actually believe Janis was a minor.  Dr. Kraft's excluded testimony bore directly on the

credibility of Soler's testimony concerning his state of mind and sought to explain (just in the converse of oft-admitted government-expert testimony) how seemingly sinister conduct could be part of innocent sexual fantasy. Cf. United States v. Long, 328 F.3d 655, 666–68 (D.C. Cir. 2003) (finding government expert's child-molester m.o. testimony probative under Rule 403 because it helped show "how seemingly innocent conduct could be part of a seduction technique" (cleaned up)).

The government's arguments made below (again, only below because the government does not defend, even in the alternative, the district court's exclusion on appeal since it thinks there was no exclusion to begin with) do not demonstrate the testimony's minimal probative value. First, although the jury may have been familiar with "sexting" and sexual role-play fantasies, we find it hard to believe that the jury would be familiar with prototypical grooming behavior by an individual seeking out sex with minors and thus how that behavior compared to Soler's.[9]

Second, we disagree that the testimony's relevance was minimal because Soler "was not accused of being a pedophile or child molester and he was not charged with possession of child

_____

[9] Nor do we have any information to confirm this speculation about the jurors' knowledge of sexting, sexual roleplay, or grooming behaviors. Although Soler proposed certain voir dire questions that may have revealed some jurors' familiarity with these concepts, the district court declined to ask those questions at jury selection.

pornography." The government charged Soler with attempting to entice a minor to engage in unlawful sexual activity. Testimony that Soler's actions were inconsistent with the typical m.o. of one attempting to entice a minor -- as opposed to engaging in role-play with a consenting adult -- is highly relevant to that charge. Moreover, Dr. Kraft was not proffered to testify as to whether Soler was a pedophile or a child molester. He was proffered to testify only as to whether Soler's actions were consistent with patterns of known pedophiles or child molesters, similar to testimony on whether a defendant's actions are consistent with the patterns of other drug dealers in a case charging intentional distribution of drugs.

The testimony was also relevant to respond to the government's attempt to show that Soler acted like a typical predator in an effort to demonstrate his knowledge. At trial, the government elicited testimony from Agent Sieg about his use of codewords in the Craigslist post.[10] It then asked Agent Sieg: "[I]n your experience, who are the people that generally use code words[?]" To which Agent Sieg responded: "Well, anyone wanting to keep something secret or their intentions masked." The

---

[10] The codewords Agent Sieg referred to were "young," "thin," and "girls" in his initial email to Soler saying: "If you're into young thin girls say hi." Sieg testified that he used those words because they "are code words among those people who would seek to engage in illegal sexual activity with minors."

government, of course, was trying to suggest that since Soler responded to codewords like others who actually intended to keep their intentions masked (which includes those who try to engage in sex with minors), the jury should not buy Soler's feigned innocence and role-play defense. Dr. Kraft's testimony would have done the same thing, just delivering the opposite inference.

Thus, to the extent the district court found Dr. Kraft's not-a-typical-predator testimony not probative, we believe it erred. See Rubert-Torres ex rel. Cintron-Rupert v. Hosp. San Pablo, Inc., 205 F.3d 472, 479 (1st Cir. 2000) (finding abuse of discretion in assessment of probative value where we concluded the evidence was "highly relevant" to a "central issue" in the case); Espeaignnette v. Gene Tierney Co., 43 F.3d 1, 6 (1st Cir. 1994) (similar). The testimony was, in fact, highly relevant to and probative of the central issue in this case: Soler's belief that Janis was a minor.[11]

---

[11] Our decision in Pires is not to the contrary. There, a defendant sought to introduce expert evidence that he did not have any mental illnesses, sexual deviances, or a prurient interest in children as evidence that he lacked a motive to possess child pornography. 642 F.3d at 10. Yet we said that evidence was of "diminished relevance" because the only question in that case was whether the defendant knowingly received and possessed the child pornography, not whether he received and possessed the images related to a sexual interest in children. Id. at 10-12. Here, though, Dr. Kraft's testimony was highly probative of whether Soler's actions were consistent with role-playing or typical grooming behavior. The evidence was thus not "peripheral" as it was in Pires. See id. at 12.

Balancing act.  Given the high probative value of the evidence, we expect the countervailing interests weighing against the admission to be great to exclude the evidence.  "When proffered evidence relates to the central issue in a case, it is a difficult matter indeed to show that the prejudicial effect of that evidence substantially outweighs its highly probative nature, as Rule 403 requires."  Rubert-Torres, 205 F.3d at 479.

But the district court's reasoning, once corrected, is not so weighty.  Critically, the district court's assessment of the danger of confusion was bound up in its erroneous analysis of whether Dr. Kraft would opine on an ultimate issue in the case.  As the district court put it, "any probative value of the [testimony] is substantially outweighed by confusion of the issue at bar, to wit, [Soler]'s state of mind."  Yet as we've explained, Dr. Kraft's testimony would not opine on Soler's state of mind -- it would only offer evidence to the jury from which it could infer that Soler did not believe Janis was 13 given that he did not operate like a typical predator.  Thus, we think the potential danger of confusion posed by the testimony was substantially limited when viewed in its proper light.[12]

_____

[12] Nor were the district court's concerns about Dr. Kraft's testimony being presented in an evidentiary "vacuum" still relevant.  At trial, Soler testified and spoke directly to his own state of mind.  As the district court admitted, Dr. Kraft's testimony could be probative of whether Soler's testimony was credible, if he chose to testify.

To be sure, we share the district court's concern that expert testimony brushing up against -- but not directly touching on -- the defendant's state of mind could weigh heavily on the jurors' minds. We have often worried that jurors may be smitten by an expert's "aura of special reliability and trustworthiness" and therefore "assign more weight to expert testimony than it deserves." E.g., Pires, 642 F.3d at 12.

Yet even recognizing that risk, there are "less restrictive means to minimize the prejudice than entirely excluding" testimony. Rubert-Torres, 205 F.3d at 479 ("Because the Federal Rules of Evidence favor the admissibility of evidence, less intrusive measures to minimizing the prejudicial effect of evidence are preferred to excluding evidence."). For example, the district court instructed the jury that it should not deem Dr. Kraft credible merely because he is an expert. See United States v. Encarnacion, 26 F.4th 490, 506 (1st Cir. 2022) (noting that careful jury instructions on the weight to be given to an expert's testimony help mitigate risks of unfair prejudice from the expert's special stature). Rather, the district court told the jury that credibility calls should be made the same way whether the jury was judging Soler, Dr. Kraft, or Agent Sieg. The district court also could have crafted a specific jury instruction that Dr. Kraft's testimony should not be interpreted as an opinion on whether Soler knew that Janis was a minor, thus blunting the potential danger.

See United States v. Morris, 576 F.3d 661, 676 (7th Cir. 2009) (noting that limiting instructions, as well as careful construction of the examinations, can help alleviate risks of confusion from expert-criminal-m.o. testimony). And it could have -- as it did on Dr. Kraft's first subject of testimony -- given the government an adequate opportunity to cross-examine Dr. Kraft's not-a-typical-predator testimony. See Encarnacion, 26 F.4th at 506.

* * *

Though the district court had "wide discretion in steadying the Rule 403 seesaw," Pires, 642 F.3d at 12, it still needed to explain why the highly probative value of the evidence was so "substantially outweighed" by the risks of confusing or misleading the jury that the testimony should have been excluded wholesale, Fed. R. Evid. 403; see Rubert-Torres, 205 F.3d at 479. And the need was more pronounced considering the court's allowance of Agent Sieg's testimony about the use of codewords. The district court failed to do so, thus creating the rare and most-compelling case in which we conclude -- and do not do so lightly -- that the district court abused its discretion in excluding this testimony under Rule 403, too.

### 3. **Harmlessness**

Even if we find error in the district court's evidentiary ruling, we must affirm if we find the error nonetheless harmless.

See Rodríguez-Soler, 773 F.3d at 297. Non-constitutional errors in admitting or excluding evidence are harmless "unless the evidence 'likely affected' the trial's outcome." United States v. Correa-Osorio, 784 F.3d 11, 25 (1st Cir. 2015) (quoting United States v. Landrón-Class, 696 F.3d 62, 71 (1st Cir. 2012)). Thus, we will not reverse "if we can say with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the errors did not substantially sway the jury's verdict." United States v. Rivera-Carrasquillo, 933 F.3d 33, 46 (1st Cir. 2019) (cleaned up).

We're not so assured here. At the end of the day, the key issue in this case was whether Soler believed that Janis was 13. And though there was substantial evidence from which the jury could have concluded that he did, Soler's role-play defense turned almost exclusively on the credibility of his testimony. Dr. Kraft's not-a-typical-predator testimony could have provided substantial support to Soler's credibility in claiming that he truly believed Janis was just an assumed identity of another consenting adult. Whether the jury ultimately buys that story is for it to decide. But we could only speculate as to whether the additional evidence could have swayed the jury's credibility determination on that key element, leaving the error not

- 36 -

harmless.[13]  See Rubert-Torres, 205 F.3d at 480 ("On such a central issue as causation, . . . it would be speculation at best, much less with fair assurance, to say that the jury verdict was unaffected by the error."); United States v. Ouimette, 753 F.2d 188, 193 (1st Cir. 1985) (error not harmless where the excluded evidence went to "the core of the defendant's case"); see also United States v. Kilmartin, 944 F.3d 315, 339 (1st Cir. 2019) (finding erroneously admitted testimony not harmless to the jury's assessment of the defendant's intent since "[i]ntent is inherently difficult to demonstrate" and though there was ample circumstantial evidence of intent, the defendant offered alternative innocent explanations).[14]

**CONCLUSION**

For these reasons, we **vacate** the judgment of the district court and **remand** for a new trial.

---

[13] The government suggests that the testimony Dr. Kraft actually gave was good enough since the "basic thrust" was to suggest that some people merely role-play without acting on it. Yet the government glosses over the difference between Dr. Kraft's proposed role-play-based testimony and not-a-typical-predator-based testimony, which were two distinct categories of testimony. The latter builds implicitly on the first (i.e., there is a difference between a true predator and a mere role-player), but the government has not directed us to anywhere in the record that Dr. Kraft actually testified that Soler's actions were inconsistent with the modus operandi of child sex predators.

[14] Given our conclusion, we need not address whether a new trial is required because of alleged prosecutorial misconduct -- though we do caution the government to take greater care in its in-court statements before the jury on remand.

**- CONCURRING OPINION FOLLOWS -**

**WOODCOCK, District Judge, concurring.** I write separately because I am not convinced that the record establishes that Soler properly preserved at the trial court the error he presents here as required by Federal Rule of Evidence 103 or that the district court ever excluded the expert's evidence about the characteristics of sexual predators and their typical patterns of behavior and use of the internet.

Although the district judge changed his mind about the admissibility of Dr. Kraft's testimony in prior orders, his final ruling just before trial was:

> The order at Docket No. 95 is hereby amended as follows. Should defendant testify at trial, following said testimony the Court will allow the testimony of Dr. Kraft. See US v Joseph, 542 F3d 13, 21 (2nd Cir. 2008).

Nothing in this final order intimated that the defendant would not have been allowed to present Dr. Kraft's full testimony as Soler proposed it, including his testimony about sexual predators and the internet. I am unable to conclude that the district judge would have disallowed Dr. Kraft's testimony on sexual predation because, following this order, Soler never moved its admission and never received a definitive ruling against its admission.

Tracking the way this issue developed at trial, I see the district judge's first concern turning on whether Dr. Kraft would be allowed to testify if Soler did not take the stand, an offshoot of the government's argument that Dr. Kraft's opinion

testimony should not be a backdoor way of admitting Soler's testimony.  In my view, the district judge was rightfully concerned about the prospect of Dr. Kraft testifying about Soler and then Soler declining to testify, leaving Dr. Kraft's testimony - to the extent it relied upon Soler's testimony - being without foundation. Once defense counsel informed the jury in the opening statement that Soler intended to take the stand, the district judge's concern on this point was alleviated, but the district judge still had the obligation to enforce Federal Rule of Evidence 704(b), which prohibited Dr. Kraft from expressing an opinion "about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or a defense."  Fed. R. Evid. 704(b).

I see Soler's argument that he preserved this evidentiary issue by giving the prior Notice of Expert as falling flat.  It is true that a definitive ruling on a pretrial motion in limine may preserve an objection to an evidentiary ruling without requiring the party to renew the objection at trial.  Fed. R. Evid. 103(b); United States v. Grullon, 996 F.3d 21, 30 (1st Cir. 2021); Zachar v. Lee, 363 F.3d 70, 75 (1st Cir. 2004) ("The 2000 Amendment to Federal Rule of Evidence 103 specifically provides that once the district court 'makes a definitive ruling on the record admitting . . . evidence, either at or before trial, a party need not renew an objection . . . to preserve a claim of error for

appeal.'" (quoting Fed. R. Evid. 103(a)(2), now denominated as Fed. R. Evid 103(b))). The problem here is that, as just noted, the district judge's last ruling before trial allowed the expert's testimony without qualification. As a result, in my view, the defendant's motion in limine and Notice of Expert did not preserve this issue on appeal because the district court's superseding ruling allowed the expert's testimony to come in at trial (under the condition that Soler testify, which he did).

It appears to me that the defense confused the district judge's repeated rulings about Federal Rule of Evidence 704(b) with a ruling excluding the expert's testimony on sexual predation. The line between proper and improper expert testimony in this area is subtle and it strikes me that the district judge's concern that the expert not "talk about [Soler]" was a reminder that Rule 704(b) prohibits an expert from expressing opinions about a defendant's state of mind. My view is buttressed by the fact that the district judge emphasized both during trial and in the post-trial order that Dr. Kraft never interviewed Soler and therefore could not testify about him.

To the extent that the defense was confused about the district judge's rulings and the line between proper and improper expert testimony, the burden was on defense counsel to obtain a definitive ruling and, if the evidence were disallowed, to make an offer of proof. Fed. R. Evid. 103(a)(2) ("[I]f the ruling excludes

evidence, a party informs the court of its substance by an offer of proof, unless the substance was apparent from the context."); see Kelley v. Airborne Freight Corp., 140 F.3d 335, 347 (1st Cir. 1998); Earle v. Benoit, 850 F.2d 836, 847 (1st Cir. 1988) ("[I]t is precisely for such a situation, where a court refuses to receive evidence and yet the same is needed to elucidate proponent's claim for admissibility, that the offer of proof device exists.").

We do not know what would have happened at trial if defense counsel had complied with Federal Rule of Evidence 103, approached sidebar, cited United States v. Romero, 189 F.3d 576 (7th Cir. 1999), and informed the judge that the defense would like to explore Dr. Kraft's expert views about the significance of already admitted evidence, namely the online chats, and to elucidate Dr. Kraft's views of the hallmarks of an online predator, such as the presence of collections of child pornography, the grooming of children, and employment or activities that involve children, and how those hallmarks compared to Soler's background and behavior as already set forth on the record or to be supplied by Soler's later testimony. The defense could have reminded the judge that none of this proffered evidence would have suggested what the defendant himself thought, only what Dr. Kraft in his expert opinion would have expected to find in a case of online sexual predation and that any opinion as to how Soler's behavior compared with typical sexual predators was based on the evidence

- 42 -

presented at trial and not a clinical examination.  If the defense had done so, we would know for certain whether the trial judge would have excluded all, part, or none of Dr. Kraft's proposed and unpresented testimony.  But we do not know how the district judge would have ruled because, after the judge ruled all of Dr. Kraft's testimony admissible, the district judge was never squarely asked to make a definitive ruling excluding any portion of it.

Finally, my reading of the record is further supported by the fact that on cross-examination of Dr. Kraft, the district judge allowed the government, over the defense's objection, to extensively discuss sexual predation.  Even after the government elicited this testimony, the defense made no effort to present Dr. Kraft's sexual predation testimony on the ground that the government had opened the door.  Instead, the defense asked no further questions of Dr. Kraft.

Before we assign error to a district court's evidentiary ruling, we should be clear that the trial court actually excluded the admissible evidence and typically the burden is on the losing party to demonstrate that he clarified his objection and obtained a definitive ruling excluding the evidence.  See Grullon, 996 F.3d at 30-31 ("[W]hen a judge issues a preliminary, conditional, or 'tentative' ruling that 'clearly invites the party to offer the evidence at trial,' then the party has an obligation to raise it again to preserve the claim." (quoting United States v. Almeida,

748 F.3d 41, 50 (1st Cir. 2014)); <u>United States</u> v. <u>Takesian</u>, 945 F.3d 553, 562 (1st Cir. 2019) ("Rule 103 requires the objecting party . . . 'to clarify whether an in limine or other evidentiary ruling is definitive when there is doubt on that point.'" (quoting <u>Crowe</u> v. <u>Bolduc</u>, 334 F.3d 124, 133 (1st Cir. 2003))).

Despite my reservations about whether the error was preserved and whether the district judge committed any error, I am concurring, not dissenting, because after the trial, the defendant and the government both treated Dr. Kraft's evidence on sexual predation as having been excluded. In its response to the defendant's claim in his post-trial briefing that Dr. Kraft's sexual predation testimony should not have been excluded, the government did not claim that the district judge never excluded it. To the contrary, in its post-trial memorandum, the government argued:

> Accordingly, the Court properly determined that the proposed testimony was irrelevant and, even if relevant, it should be excluded because its probative value was far outweighed by the potential for confusing and misleading the jury, and unnecessarily protracting the trial.

In contrast, the trial judge's post-trial ruling does not appear to be based on the parties' mutual misunderstanding of the basis for exclusion at trial:

> [T]he exclusion of part of Dr. Kraft's expert testimony was warranted. It is undisputed that he did not evaluate, interview, meet nor

treat defendant. He himself admitted this at trial upon questioning by the Court. Thus, Dr. Kraft could not testify as to defendant's state of mind.

In my view, the parties' post-trial arguments and the district judge's post-trial ruling pass like ships in the night. The parties, including the government, claim that the trial court excluded Dr. Kraft's proposed testimony as irrelevant, and the trial judge reiterates that he excluded only Dr. Kraft's testimony about the defendant's state of mind, which is consistent with Rule 704(b).

The situation evidenced by the record is thus unusual, if not unique. Fairly read, I cannot find a defense objection consistent with the preservation requirements of Federal Rule of Evidence 103, but the record strongly suggests that both the government and the defense believed that the district judge excluded the sexual predation part of the proffered expert testimony. If only the defendant had misunderstood the trial judge, it would be one thing, but here, as evidenced by its post-trial filing, the government was also under the misimpression that the trial judge had excluded this part of Dr. Kraft's testimony as irrelevant. From the government's post-trial filing, I agree that even if the government's position does not quite tie the bow on the question of preservation, both parties, for whatever reason, treated the district judge's rulings and reminders as prohibiting

the sexual predation testimony of Dr. Kraft rather than as reminders of the boundaries of Rule 704(b). In my view, although the issue is a close one, there is enough play within Federal Rule of Evidence 103(e) to allow us to reach the substantive question, even absent proper preservation. Fed. R. Evid. 103(e) ("A court may take notice of a plain error affecting a substantial right, even if the claim of error was not properly preserved.").

Given this conclusion, and for the reasons well stated by the majority, I join in the majority's conclusion that the jury should have been presented with Dr. Kraft's proposed testimony about sexual predation and the internet, including the characteristics and behavioral patterns of a typical online predator. I am also influenced by the majority's view that Dr. Kraft's expert opinion on the hallmarks of online sexual predation and the significance of the online chats in this case could have made a difference in the jury verdict and therefore, I concur with the majority's resolution of this appeal.